**UNITED STATES of America, Plaintiff,**

v.

**Jorge ESPARZA–MENDOZA, Defendant.**

No. 1:02–CR–00099 PGC.

United States District Court, D. Utah, Northern Division.

May 29, 2003.

Laurie J. Sartorio, Salt Lake City, UT, for Plaintiff.

Benjamin A. Hamilton, Salt Lake City, UT, for Defendant.

1. Indictment (# 1–1) (alleging violation of 8 U.S.C § 1326(a)).

2. Notice of Sentencing Enhancement (# 2–1).

## MEMORANDUM OPINION DENYING MOTION TO SUPPRESS

CASSELL, District Judge.

The defendant, Jorge Esparza–Mendoza, has been charged in a one-count indictment with illegal reentry by a previously removed alien.[1] The government has also filed a notice of sentencing enhancement, alleging that Esparza–Mendoza has been previously convicted of felony possession of cocaine.[2] Esparza–Mendoza has filed a motion to suppress evidence, alleging that his Fourth Amendment rights were violated. The court held an evidentiary hearing on this motion on February 4, 2003, at which both sides were well represented by counsel. The court received supplemental briefing following the hearing. Having fully considered the evidence and the briefs, the court DENIES the motion to suppress. The court concludes that as a previously-removed alien felon, Esparza–Mendoza cannot assert a violation of the Fourth Amendment because he is not one of "the People" the Amendment protects.

### BACKGROUND

The facts surrounding the issue are largely undisputed. Around March 1997, Esparza–Mendoza illegally entered the United States from Mexico. He is a Mexican national and never attempted to legalize his status. On April 19, 1999, he was convicted in state court in Utah of a felony. Shortly after this conviction, the Immigration and Naturalization Service ("INS") notified him that he would be removed from the United States because of the conviction.[3] Esparza–Mendoza was given an opportunity to contest the deportation, which he waived. Accordingly, on May 20, 1999, INS ordered that Esparza–Mendoza

be removed. He was instructed that he was not to re-enter the country and warned of the criminal consequences of attempting to do so.[4] On May 22, 1999, Esparza–Mendoza was deported to Mexico.

At some later point, Esparza–Mendoza again illegally entered this country. On October 27, 2002, he was in Kearns, Utah, when the events subject to the motion to suppress took place. At that time, Officer Tracey L. Cook of the Salt Lake Sheriff's Office responded to a call reporting a domestic dispute between two sisters. When the officer arrived, she saw three neighbors standing outside, who said they had called in the complaint, and two women at the residence in question. Officer Cook questioned one of the women outside the residence about what had happened. The woman said that she had a verbal dispute with her sister and that her father was coming to pick her up. Officer Cook then questioned the other woman. This woman related a consistent story, except she said that during the dispute her sister threw a brick at a car. When Officer Cook questioned her further about the car, the woman stated that it belonged to her boyfriend and that "he didn't want anything done about it." [5] Officer Cook told the woman that she needed to speak with him to verify some information from him and question him about the damage that was done. The woman told Officer Cook that her boyfriend was inside the residence and she would get him.

Pursuant to Officer Cook's request, Esparza–Mendoza then came outside to the front porch. Officer Cook asked Esparza–Mendoza if the vehicle belonged to him. Esparza–Mendoza stated that it was not actually his car, but that it belonged to his sister or brother. Officer Cook stated that she needed to get some identification from him to make sure that everything checked out properly. Esparza–Mendoza responded that he did not want to be involved and did not want to provide his identification.[6] Officer Cook then asked a second time for his identification, stating that she "needed" to see it.[7] It was not put in terms that Esparza–Mendoza had an option to do this, but rather in terms that he was directed to do so. Officer Cook also testified that she had no belief at this time that Esparza–Mendoza had committed any crime.

Pursuant to Officer Cook's direction, Esparza–Mendoza produced an identification card. Officer Cook checked his name with a dispatch officer, who advised that Esparza–Mendoza was a deported felon and that there was fugitive warrant on him. Officer Cook then contacted an INS agent in order to verify that she was detaining the correct person. Esparza–Mendoza spoke with the agent on the phone for some time. The INS agent ultimately told Officer Cook that Esparza–Mendoza was the correct person on the warrant. Officer Cook thereafter detained Esparza–Mendoza, and the United States charged him with illegal reentry.

### DISCUSSION

Esparza–Mendoza filed a timely motion to suppress under the Fourth Amendment, seeking to suppress his identification card and, as the fruit of that card, his identity and all information related to his prior deportation. Esparza–Mendoza also sought to suppress the incriminating statements that he made to Officer Cook and the INS agent. His argument is that he was detained and forced to present his identification without probable cause or

---

**4.** *Id.*

**5.** Tr. 2/3/03 at 15.

**6.** *Id.* at 28.

**7.** *Id.* at 29.

even reasonable suspicion. The United States has raised several responses, including an unresolved constitutional issue in the Tenth Circuit—whether previously removed alien felons can raise Fourth Amendment challenges. Because of the complexity of this unresolved issue, the court will first determine whether that issue can be avoided by resorting to the United States' other contentions.

## I. Consensual Encounter.

■ On the merits of Esparza–Mendoza's Fourth Amendment claim, the United States contends that he was not detained but rather was involved in a brief "consensual encounter" with the officer. To be sure, the amount of time involved in this transaction might appear to be de minimis—the total elapsed time during which the officer held Esparza–Mendoza's identification card could not have been more than a minute or two. The officer called on her radio from the porch.[8] During that brief time, however, Officer Cook directed Esparza–Mendoza to produce his identification after he had declined to do so. Unlike such cases as *Florida v. Bostick*[9] in which the questioned suspect was "free to decline the officer's request or otherwise terminate the encounter,"[10] Esparza–Mendoza was forced to produce identification. Indeed, in *I.N.S. v. Delgado* (a case cited by the United States), the Supreme Court directly stated it would find a detention "if the [questioned] person[ ] refuses to answer and the police take additional steps ... to obtain an answer...."[11] Here, Esparza–Mendoza refused to answer and the

police took the additional step of directing him to answer.

Of course, a detention can be justified if there is some reasonable suspicion by the police. Moreover, the shorter the detention, the less justification that is required. But in this case, the United States has not offered *any* reasonable suspicion that might justify the detention. At the suppression hearing, Officer Cook stated directly that she had no belief that the defendant had committed any crime. She did not advance any other reason for suspicion. Nor has the United States raised any other justification for requesting Esparza–Mendoza's identification (such as the need for record keeping regarding crime victimization). On this record, Esparza–Mendoza was detained—albeit briefly—without reasonable suspicion—and, therefore, in violation of his Fourth Amendment rights.

## II. Identity of the Defendant as a Suppressible Fruit of a Fourth Amendment Violation.

■ The United States also maintains that Esparza–Mendoza's identity is not a suppressible fruit of any Fourth Amendment violation. As the United States candidly articulated in its brief, the circuits may be split on this issue. The Ninth Circuit, for example, has held that the "defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search."[12] The Fifth Circuit has reached an identical conclusion.[13] In contrast, the

---

8. Tr. 2/3/03 at 31.

9. 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

10. *Id.* at 430, 111 S.Ct. 2382.

11. 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

12. *United States v. Guzman–Bruno*, 27 F.3d 420, 421 (9th Cir.1994), *cert. denied*, 513 U.S. 975, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994).

13. *United States v. Roque–Villanueva*, 175 F.3d 345, 346 (5th Cir.1999).

Eighth Circuit appears to disagree. The Eight Circuit takes the position that, while the defendant may be brought to court following an illegal search, any evidence resulting from the illegal search must be suppressed. Thus, the Eighth Circuit suppressed fingerprint evidence the government sought to use to establish a defendant's identity because the evidence came from an unlawful traffic stop.[14] The Tenth Circuit does not appear to have addressed this question in a published opinion, although an unpublished opinion from the circuit can be read as indirectly suggesting it might find the views of the Ninth and Fifth Circuits persuasive.[15]

Even if this court followed the approach of the Ninth and Fifth Circuits, however, that would not entirely resolve Esparza–Mendoza's motion to suppress. The United States seeks to introduce not merely the identity of the defendant and but also incriminating statements made by him.[16] While the Supreme Court will not suppress "the 'body' or identity of a defendant" under the Fourth Amendment's exclusionary rule,[17] other evidence—including incriminating statements—is suppressible.[18] Therefore, determining whether the identity of the defendant escapes suppression will not fully resolve this case. The court thus must confront the threshold issue raised by the United States—whether Esparza–

Mendoza has the capacity to raise these Fourth Amendment issues.

### III. Coverage of Previously Removed Alien Felons by the Fourth Amendment.

The United States has argued that the defendant—as a previously removed alien felon—lacks standing to assert Fourth Amendment issues in his motion to suppress. Esparza–Mendoza responds that he possesses such standing. Both parties have characterized this issue as one of "standing." Such terminology is understandable, as it is frequently used by criminal law practitioners and leading law school casebooks.[19] Despite the familiarity of this term, however, it is not the correct terminology for the dispute at issue. As the Tenth Circuit recently explained, "The Supreme Court has repeatedly insisted that we not use the term 'standing' as shorthand for a defendant's capacity to challenge a search."[20] Instead, the Supreme Court has directed that this issue be described as "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."[21] The court will proceed, then, to use the methodology adopted by the Supreme Court and determine the interests that the defendant might argue have been infringed.

---

**14.** *United States v. Guevara–Martinez,* 262 F.3d 751 (8th Cir.2001).

**15.** *See United States v. Cisneros–Cruz,* 185 F.3d 875, 1999 WL 444926 (10th Cir.1999) (unpublished).

**16.** Tr. 2/3/03 at 6, 9–10.

**17.** *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1039, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984).

**18.** *See, e.g., Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

**19.** *See, e.g.,* YALE KAMISAR ET AL., MODERN CRIMINAL PROCEDURE 749 (10th ed.2002) (section on "standing").

**20.** *United States v. Higgins,* 282 F.3d 1261, 1270 n. 3 (10th Cir.2002); *see also United States v. Gordon,* 168 F.3d 1222, 1225 n. 2 (10th Cir.1999).

**21.** *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The Fourth Amendment protects "[t]he right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[22] In construing this Amendment, the Supreme Court also instructed that it protects people, not places.[23] The question thus arises whether Esparza–Mendoza, who was previously removed from the United States as an illegal alien and aggravated felon and who subsequently illegally reentered the United States, belongs to the community of persons covered by the phrase "the people" in the Fourth Amendment. To answer that question, the court must first review prior Supreme Court precedents and then constitutional text, history, and structure.

### A. The "Sufficient Connection" Test from Verdugo–Urquidez.

■ The application of the Fourth Amendment to previously removed aliens appears to be unresolved in both the Supreme Court and the Tenth Circuit. The most instructive Supreme Court precedent is the 1990 decision, *United States v. Verdugo–Urquidez*.[24] In that case, the Court considered a challenge by a Mexican resident to a search of his residence in Mexico by American law enforcement officials. In rejecting his challenge, Chief Justice Rehnquist's opinion for the Court noted that the term "the people" seems "to have been a term of art employed in selected parts of the Constitution":

The preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people."[25]

Similarly, the Court recounted, the First Amendment provides "Congress shall make no law ... abridging ... the right *of the people* to peaceably assemble"[26] and article I, section 2 provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by *the People* of the United States."[27] *Verdugo–Urquidez* declared: "While this textual exegesis is by no means conclusive, it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments ... refers to a class of persons who are *part of a national community* or who have otherwise *developed sufficient connection with this country to be considered part of that community.*"[28]

*Verdugo–Urquidez* also distinguished an earlier 1984 ruling in *INS v. Lopez–Mendoza*.[29] While that case arguably could have been read as broadening the reach of the Fourth Amendment to illegal aliens, *Verdugo–Urquidez* concluded that the decided issues in *Lopez–Mendoza* "did not encompass whether the protections of the Fourth Amendment extend[ed] to illegal aliens in this country."[30] *Verdugo–Urquidez* therefore concluded that "[o]ur statements in *Lopez–Mendoza* are therefore not dispositive of how the Court would rule

---

**22.** U.S. CONST. amend. IV (emphasis added).

**23.** *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**24.** 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

**25.** *Id.* at 265, 110 S.Ct. 1056.

**26.** U.S. CONST. amend. I (emphasis added).

**27.** U.S. CONST., art. I, § 2, cl. 1 (emphasis added).

**28.** 494 U.S. at 265, 110 S.Ct. 1056 (emphasis added).

**29.** 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984).

**30.** 494 U.S. at 272, 110 S.Ct. 1056.

on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us."[31] Such a question, the Court reasoned, would turn on the extent to which illegal aliens had accepted "societal obligations."[32]

Finally, *Verdugo–Urquidez* found unpersuasive cases cited by the defendant in which aliens were recognized as enjoying certain constitutional rights. The Court found that these cases "establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed *substantial connections* with this country."[33] For instance, *Kwong Hai Chew v. Colding*[34] held that "[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien *lawfully* enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders."[35] Holdings such as these could not help Verdugo–Urquidez because he was "an alien who has had no previous *significant* voluntary *connections* with the United States."[36]

Based on *Verdugo–Urquidez*, it appears that the issue in this case devolves to whether Esparza–Mendoza is "part of a national community" or otherwise has "developed sufficient connection with this country to be considered part of that community." A few lower courts and commentators, however, have suggested that this "sufficient connection" language in the *Verdugo–Urquidez* is not binding precedent because, in their view, it comes from a mere plurality opinion. Chief Justice Rehnquist's opinion was joined by Justices White, O'Connor, Scalia, and Kennedy—a majority of the Court. However, Justice Kennedy authored a concurring opinion which, some have argued, is at odds with the opinion of the Chief Justice. For example, the United States District Court for the Northern District of California has concluded that Justice Kennedy "in his separate concurrence, disputed, in large part, the analysis presented in the 'majority' opinion, particularly with respect to whether the Fourth Amendment protects illegal aliens."[37]

This court concludes it is required to follow the views in the Chief Justice's opinion for the Court. The opinion begins: "Chief Justice Rehnquist delivered the opinion *of the Court.*"[38] Moreover, Justice Kennedy's concurring opinion is quite explicit on this point: "Although some explanation of my views is appropriate given the difficulties of this case, I do not believe they depart in fundamental respects from the opinion of the Court, *which I join.*"[39] To be sure, when "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."[40] But the

---

31. *Id.*

32. *Id.* at 273, 110 S.Ct. 1056.

33. *Id.* at 271, 110 S.Ct. 1056 (emphasis added).

34. 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

35. *Id.* at 596 n. 5, 73 S.Ct. 472 (emphasis added) (internal citations omitted).

36. *Verdugo–Urquidez,* 494 U.S. at 271, 110 S.Ct. 1056 (emphasis added).

37. *United States v. Guitterez,* 983 F.Supp. 905 (N.D.Ca.1998).

38. *Verdugo–Urquidez,* 494 U.S. at 261, 110 S.Ct. 1056 (emphasis added).

39. *Id.* at 275, 110 S.Ct. 1056 (emphasis added).

40. *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *see*

obvious prerequisite to this doctrine is fragmentation—that is, the absence of an opinion from the Court as a whole. This court is not at liberty to second-guess Justice Kennedy's direct statement that he was joining the Court's opinion. Therefore, the Chief Justice's opinion in *Verdugo–Urquidez* commanded a majority of the Court and its "sufficient connection" language must be followed here.

Perhaps this court could depart from *Verdugo–Urquidez* if the Tenth Circuit had discerned a reason to depart from the decision. If anything, however, the Tenth Circuit may have treated the decision as binding. In the unpublished opinion *Grillet–Matamoros v. I.N.S.*,[41] the Circuit cited *Verdugo–Urquidez* without any designation that it was a plurality opinion for the proposition that "aliens receive constitutional protections when they have come within the territory of the United States and developed *substantial connections* with this country."[42] While the unpublished opinion is, of course, without precedential effect,[43] this court sees no reason to reach a different conclusion.

Another reason for declining to follow the "sufficient connection" language in *Verdugo–Urquidez* was suggested by the United States District for the District of Colorado. In *United States v. Iribe*,[44] the Colorado district court considered whether an illegal alien could assert coverage of the Fourth Amendment. In concluding that the alien could, the district court tersely determined that "[t]he broad language of the Chief Justice [in *Verdugo–Urquidez* ]

was not required for the holding...."[45] This court has carefully considered the Colorado district court's opinion. While not binding here, the district court's analysis should surely be followed if persuasive. Nonetheless, this court respectfully concludes that the Colorado district court's unelaborated analysis is inaccurate. The penultimate paragraph in *Verdugo–Urquidez* summarizing the Court's holding makes this clear. The Court explained: "We think that *the text of the Fourth Amendment,* its history, and our cases discussing the application of the Constitution to aliens and extraterritorially require rejection of respondent's claim."[46] In stating its holding, the Court thus explicitly incorporated its textual analysis described above about the "people" of the United States, from which it derived the "sufficient connection" test. Moreover, the "sufficient connection" phrase and language akin to it is found throughout the *Verdugo–Urquidez* opinion.[47] It is hard to understand how this language could be divorced from the holding in that case. This lower court must, therefore, apply the "sufficient connection" test from a controlling Supreme Court opinion.

### B.  Independent Derivation of a Sufficient Connection Test.

Even if the court is mistaken about the controlling effect of *Verdugo–Urquidez,* the court independently reaches the same conclusion that the Fourth Amendment extends only to persons who have a sufficient connection with this country. In reaching

---

*also Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**41.**  25 F.3d 1056, 1994 WL 232271 (10th Cir. 1994).

**42.**  *Id.* 1994 WL 232271, at *2 (emphasis added).

**43.**  10th Cir. Rule 36.3.

**44.**  806 F.Supp. 917 (D.Colo.1992).

**45.**  *Id.* at 919.

**46.**  494 U.S. at 274, 110 S.Ct. 1056 (emphasis added).

**47.**  *See id.* at 266, 268, 271, 273, 274, 110 S.Ct. 1056.

this conclusion, the court finds it instructive to consult the constitutional text and structure as well as the Supreme Court decisions construing analogous constitutional provisions.

### 1. Textual and Structural Analysis.

The analysis of this question must begin, of course, with the text of the Fourth Amendment, which protects "[t]he right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[48] Esparza–Mendoza takes the position that the court should read the phrase "the people" as though it extends the reach of the Fourth Amendment to all persons, or at least all persons accused of crimes. The difficulty with this position is that it ignores the textual difference between the Fourth Amendment's protection of "the People" as contrasted with the Fifth Amendment's protection of "persons"[49] and the Sixth Amendment's protection of "the accused."

Although neither side has briefed the historical understanding of these provisions, it appears the drafters of the Constitution intended the phrase "the people" to be read more narrowly than the broader formulations found in other amendments. As Chief Justice Rehnquist explained in *Verdugo–Urquidez*, the phrase "the people" appears "to have been a term of art employed in selected parts of the Constitution"[50]—specifically, in the Preamble, article I's provision dealing with popular election of the House of Representatives, and the First, Second, Fourth, Ninth and Tenth Amendments.[51] The term of art

appears to refer to persons who are part of or connected to the political community of the United States. As Professor Akhil Amar has explained in an article in the *Utah Law Review:*

> [W]hen the Constitution speaks of "the people" rather than "persons," the collective connotation is primary. In the Preamble, "We the People ... do ordain and establish this Constitution" as public citizens meeting together in conventions and acting in concert, not as private individuals.... The only other reference to "the people" in the Philadelphia Constitution of 1787 appears a sentence away from the Preamble, and here, too, the meaning is public and political, not private and individualistic: every two years, "the People"—that is, the voters—elect the House....
>
> The rest of the Bill of Rights confirms this republican reading. The core of the First Amendment's Assembly Clause ... is the right of "the people"—in essence, voters—to "assemble" in constitutional conventions and other political conclaves. Likewise, the core rights retained and reserved to "the people" in the Ninth and Tenth Amendments were rights of the people collectively to govern themselves democratically.[52]

Professor Amar goes on to specifically analyze the Fourth Amendment's use of "the people":

> The Fourth Amendment is trickier.... Here, the collective "people" wording is paired with more individualistic language of "persons" And these words obviously focus on the private domain,

---

48. U.S. CONST. amend. IV (emphasis added).

49. U.S. CONST. amend. V.

50. 494 U.S. at 265, 110 S.Ct. 1056.

51. *See* U.S. CONST., preamble, art. I, § 2, cl. 1, amends. I, II, IV, IX, X.

52. Akhil Reed Amar, *The Second Amendment: A Case Study in Constitutional Interpretation,* 2001 UTAH L.REV. 889, 892–93; *see also* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 64–77 (1998).

protecting individuals in their private homes more than in the public square. Why, then, did the Fourth use the words "the people" at all? Probably to highlight the role that jurors—acting collectively and representing the electorate—would play in deciding which searches were reasonable and how much to punish government officials who searched or seized improperly. An early draft of James Madison's amendment protecting jury rights helps make this linkage obvious ... "The trial by jury, as one of the best securities to the rights of people, ought to remain inviolate." Note the obvious echoes here—"security" (Second Amendment), "secure" (Fourth Amendment), and "securities" (draft amendment); "shall not be infringed," "shall not be violated," and "ought to remain inviolate": and, of course, "the right of the people" in all three places.[53]

Professor Amar's reading of the Fourth Amendment thus appears to suggest that it protects the right of prospective jurors, voters, and others who are sufficiently attached to the political community—the relevant "people"—to be secure "in *their* persons, houses, papers, and effects."

This reading is bolstered by an understanding of the history leading up to the drafting of the Constitution. As Judge Wallace ably explained in his dissenting opinion in the Ninth Circuit in *Verdugo–Urquidez* (significant parts of which were later upheld by the Supreme Court), "the Constitution was conceived as a 'compact' or 'social contract' among the people of the United States."[54] Judge Wallace collected considerable historical materials to support this view.[55] In particular, the "background political philosophy of the age" would have been articulated most prominently by political philosopher John Locke.[56] Locke conceived of government as a social compact in which formerly free individuals voluntarily united to establish communities.[57]

In pre-Constitution America, this compact or social contract concept of government pervaded American political philosophy in both theory and practice. For example, in 1620, the Pilgrims entered into the Mayflower Compact, in which they proclaimed that "[w]e ... solemnly and mutually ... covenant and combine ourselves together into a civil Body Politick, for our better Ordering and Preservation."[58] Later, Alexander Hamilton used much the same social contract language in explaining "the origin of all civil government, justly established, must be a voluntary compact between the rulers and the ruled, and must be liable to such limitations as are necessary for the security of the absolute rights of the latter."[59] The social compact view is perhaps most famously echoed in the Declaration of Independence, which declared that "governments are instituted among men, deriving their just powers from the consent of the governed."[60] This corre-

---

53. *Id.* at 893.

54. *United States v. Verdugo–Urquidez*, 856 F.2d 1214, 1231 (9th Cir.1988) (Wallace, J., dissenting), *rev'd*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

55. *See id.* at 1232–33.

56. *City of Boerne v. Flores*, 521 U.S. 507, 540 n. 1, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (Scalia, J., concurring in part).

57. *See generally* JOHN LOCKE, TWO TREATISES OF GOVERNMENT—SECOND TREATISE (P. Laslette ed.1960).

58. Mayflower Compact, Nov. 11, 1620, *reprinted in* SOURCES OF OUR LIBERTIES: DOCUMENTARY ORIGINS OF INDIVIDUAL LIBERTIES IN THE UNITED STATES CONSTITUTION AND BILL OF RIGHTS 60 (R. Perry ed.1959).

59. Alexander Hamilton, *The Farmer Refuted*, Feb. 23, 1775, in THE FOUNDERS' CONSTITUTION 91 (P. Kurland & R. Lerner ed.1987).

60. DECLARATION OF INDEPENDENCE (U.S.1776).

sponds directly to Locke's contention that "Men are naturally free, and the Examples of History sh[o]wing, that the Governments of the World, that were begun in Peace, and their beginning laid on that foundation, and were made by the Consent of the People." [61] And, as one last example, in the Preamble to the Massachusetts Constitution of 1780, the people of that state proclaimed directly: "The body politic is formed by a voluntary association of individuals: it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." [62]

Against that backdrop, it is unsurprising to find that the Supreme Court has described the Constitution as a compact between the people of the United States and its government. Only a few years after the ratification of the Constitution, Chief Justice John Jay observed that every state constitution "is a compact ... and the Constitution of the United States is likewise a compact made by the people of the United States to govern themselves." [63] In *McCulloch v. Maryland*,[64] Chief Justice Marshall declared that "[t]he government of the Union ... is emphatically and truly, a government of the people.... It emanates from them. Its powers are granted by them, and are to be exercised directly

on them, and for their benefit." [65] And in 1850, the Supreme Court stated "[t]he Constitution of the United States was made by, and *for the protection of, the people of the United States.*" [66]

In the light of this historical understanding of the Constitution as a social compact, the Fourth Amendment's protection of "the People" does not appear to be a mere rhetorical flourish. Rather, the phrase was apparently used to connote the political community who made a compact to govern themselves. This interpretation is confirmed by the drafting history of the Fourth Amendment. Like most of the provisions of the Bill of Rights, "the Fourth Amendment was derived from provisions already existing in state constitutions." [67] Four state constitutions contain language similar to the Fourth Amendment—Pennsylvania, Vermont, Massachusetts, and New Hampshire.[68] Of these, two appear to have been the source of the phrase "the People" that ultimately appeared in the Fourth Amendment—Pennsylvania and Vermont. The Pennsylvania Declaration of Rights of 1776 is "the first precedent which closely approximated what is now the Fourth Amendment to the United States Constitution." [69] Section 10 of the Declaration provided:

... *the people* have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and

---

**61.** J. LOCKE, *supra*, § 194g at 354; *see also id.* § 119, at 365–66. *See generally* Donald L. Doernberg, *"We the People:" John Locke, Collective Constitutional Rights, and Standing to Challenge Government Action*, 73 CAL. L.REV. 52 (1985).

**62.** Constitution of Massachusetts, Oct. 29, 1780, in SOURCES OF OUR LIBERTIES, *supra*, at 373.

**63.** *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 471, 1 L.Ed. 440 (1793).

**64.** 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819).

**65.** *Id.* at 405.

**66.** *League v. De Young*, 52 U.S. (11 How.) 185, 203, 13 L.Ed. 657 (1850) (emphasis added).

**67.** *Minnesota v. Carter*, 525 U.S. 83, 93, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Scalia, J., concurring).

**68.** *Id.*

**69.** NELSON B. LASSON, THE HISTORY AND DEVELOPMENT OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION 81 (1937).

therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected place, or to seize any person or persons, his or their property, not particularly described, are contrary to that right, and ought not to be granted.[70]

The next year—1777—Vermont largely tracked the language Pennsylvania used[71] and similarly adopted a declaration of rights declaring:

> ... *the people* have a right to hold themselves, their houses, papers and possession free from search and seizure; and therefore warrants, without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.[72]

What is interesting about both of these state constitutional provisions is that they draw on social contract premises. The Pennsylvania Declaration of Rights stated that "government is, or ought to be, instituted for the common benefit, protection and security of *the people, nation, or community.*"[73] The Vermont Declaration of Rights likewise indicated that "all government ought to be instituted and supported, for the security and protection of the *com-munity,* as such, and to enable *the individuals who compose it,* to enjoy their natural rights...."[74] Thus, in borrowing the phrase "the People" from the Pennsylvania and Vermont constitutions, the Framers of the United States Constitutions were using a phrase that connoted a connection to a political community.

### 2. Supreme Court Precedents.

Reading the Fourth Amendment as extending to persons with a sufficient connection to the political community of the country is supported not only by constitutional text and history, but also by Supreme Court interpretations of other constitutional provisions. The Supreme Court has broadly read the Fourteenth Amendment and other provisions protecting "persons" as extending to all persons within the United States, including those here illegally (at least in some cases). Thus, in finding illegal aliens protected by the Equal Protection Clause, *Plyler v. Doe*[75] explains that this Amendment's provisions "are universal in their application, to all *persons* within the territorial jurisdiction."[76] *Plyler* reasoned, "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term."[77] Similarly, an illegal alien is a "person" protected by the Fifth Amendment from deprivation of life, liberty or property without due process of law.[78] In contrast, the First Amendment uses the term "people" to describe part of

---

**70.** PA. CONST., Art. X (1776) (emphasis added).

**71.** *See* TELFORD TAYLOR, TWO STUDIES IN CONSTITUTIONAL INTERPRETATION 42 (1969).

**72.** VT. CONST., ch. I, § XI (1777) (emphasis added).

**73.** PA. CONST., Art. V (1776) (emphasis added).

**74.** VT. CONST., Preamble (1777) (emphasis added).

**75.** 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

**76.** *Id.* at 212, 102 S.Ct. 2382 (emphasis added, internal quotation omitted).

**77.** *Id.* at 210, 102 S.Ct. 2382.

**78.** *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49–50, 70 S.Ct. 445, 94 L.Ed. 616 (1950) (emphasis added); *see also Demore v. Kim,* —— U.S. ——, 123 S.Ct. 1708, 1717, 155 L.Ed.2d 724 (2003).

its reach. Apparently relying on this fact (at least in part), *United States ex rel. Turner v. Williams*[79] found deportable aliens outside the protection of the First Amendment, explaining that:

> It is, of course, true, that if an alien is not permitted to enter this country, or, having entered contrary to law, is expelled, he is in fact cut off from worshiping or speaking or publishing or petitioning in the country; but that is merely because of his exclusion therefrom. He does not become *one of the people* to whom these things are secured by our Constitution by an attempt to enter, forbidden by law. To appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist, those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise.[80]

Applying this mode of analysis to the Fourth Amendment, those who are "excluded" cannot assert Fourth Amendment rights. In other words, only those who are "included"—that is, who are "citizens or otherwise" connected to the country—are covered by the Fourth Amendment.

### 3. Sufficient Connection Test.

It might be objected that limiting the reach of the Fourth Amendment to those who are part of the national political community unfairly excludes many persons. Yet an interpretation of the Fourth Amendment phrase "the People" that recognizes its historical foundation would not operate so mechanistically as to exclude all but the nation's voters. The Founders likely would have understood the term "the People" as extending beyond just those persons who were formally a part of the nation's political community to include those who were closely connected with such persons. For example, while women did not receive the franchise until 1920,[81] the structure of the Fourth Amendment indicates that they would have fallen within its coverage. Perhaps the simplest way to prove this point is to note that the Fourth Amendment speaks of the right of the People to be free "in their persons, *houses*, papers, and effects." Occupants of houses would naturally have included women who did not vote, and it is hard to imagine that Framers would have left them outside the coverage of a constitutional provision. A leading case from the Massachusetts Supreme Court decided in 1816 held that it is trespassing for a sheriff to break into a house to capture a boarder who lived there. The court cited authorities that were contemporaries of the drafters—Foster, Hale, and Coke—as holding that the "inviolability of dwelling-houses" extends to "the occupier or any of his family...."[82] To similar effect is the Vermont Declaration of Rights of 1777, which was a likely source of language for the Fourth Amendment. Vermont's Declaration provided protection against unreasonable searches of "his, *her*, or their property...."[83]

In light of these examples, it appears that the Framers of the Fourth Amendment intended to extend coverage to members of the political community and those closely connected to them—their families, for instance. The question then arises whether aliens, like the boarder and family

---

79. 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904).

80. *Id.* at 292, 24 S.Ct. 719 (emphasis added).

81. U.S. Const. amend. XX.

82. *Oystead v. Shed,* 13 Mass. 520, 523, 1816 WL 1100 (1816).

83. Vt. Const., ch. I, § XI (1777) (emphasis added).

members discussed in the Massachusetts case, have been invited to share the protections extended to the political community. Tourists from overseas and legally resident aliens would appear to be prime candidates for inclusion under a sufficient connection test. But the narrow issue here is not whether these more expansive categories of aliens are covered, but whether a previously deported alien *felon* is covered. It is to this issue the court now turns.

### C. Application of the Sufficient Connection Test to Previously Deported Alien Felons.

The preceding sections establish that the court must determine whether Esparza–Mendoza has a sufficient connection to the political community of the United States to assert Fourth Amendment rights. That issue can best be understood by examining, first, the historical background regarding the attachment of alien felons to the political community and, second, the specific facts surrounding Esparza–Mendoza.

### 1. The Original Understanding Concerning Criminal Aliens.

At first blush, it might be argued that the Framers would have understood all aliens as standing outside the political community of the times. The Constitution itself limits membership in the House of Representatives and Senate to citizens for seven and nine years respectively,[84] and restricts the Presidency to "natural born citizen[s]."[85] The Constitution also directs

that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[86] The later-adopted Fourteenth Amendment gives only citizens the protection of their privileges and immunities and the right to vote.[87] From these provisions, it might be inferred that the aliens could not vote and therefore stood outside of the political community identified as "the People" in the Fourth Amendment.

Historical practice on alien voting is, however, somewhat more complicated. While the Framers adopted the provisions just discussed, they also decided against a uniform federal rule for voter qualification. Instead, for the popularly-elected House of Representatives, the Framers specified voting "by the People of the several states."[88] This effectively left voter qualification to the vagaries of state law.

The voting rights of aliens under state law in the period surrounding the drafting of the Constitution is subject to differing interpretations. Some authorities suggest that aliens lacked a right to vote. Perhaps the most extensive expression of this view comes from an 1811 decision of the Massachusetts Supreme Court, which interpreted its state constitution as extending voting rights only to citizens—not aliens.[89] In 1855, a Justice on the New Jersey Supreme Court reached a similar conclusion.[90] As one last example, a survey of colonial election laws contends that, as a general matter, persons considered foreigners did not possess voting rights.[91]

---

84. U.S. CONST., art. I, § 2, cl. 2; § 3, cl. 3.

85. U.S. CONST., art. I, § 1 cl. 5.

86. U.S. CONST., art. IV, § 2.

87. U.S. CONST. amend. XIV.

88. U.S. CONST., art. I, § 2, cl. 2.

89. In re *Opinion of Justices*, 7 Mass. 523, 1811 WL 1136 (1811).

90. *Elkin v. Deshler*, 25 N.J.L. 177, 186, 1855 WL 4308 (1855) (opinion of Haines, J.).

91. A. MCKINLEY, THE SUFFRAGE FRANCHISE IN THE THIRTEEN ENGLISH COLONIES IN AMERICA 474–75 (1905).

On the other hand, some modern scholars have argued that alien suffrage was more extensive than has been previously recognized. Perhaps the most extensive statement of this position comes from Professor Gerald Neuman's informative book, *Strangers to the Constitution.*[92] He collects various examples of state practices following on the heels of the ratification of the Constitution that appear to suggest that aliens were allowed to vote.[93] He also points out that in 1874 the United States Supreme Court declared that "citizenship has *not in all cases* been made a condition precedent to the enjoyment of the right of suffrage."[94] A similar argument is made by Professor Rosberg, who contends that "there is evidence indicating that some aliens were allowed to vote as 'inhabitants' of the states in which they lived."[95] He concludes "there was little effort in the latter part of the eighteenth century to declare specifically that only citizens could vote, and voting by unnaturalized aliens may well have been common during this period."[96]

Both Professor Neuman and Professor Rosberg recognize, however, that whatever the practice was at the time of the drafting of the Constitution, aliens were excluded from the franchise relatively quickly, generally within the early decades of the nineteenth century.[97] It is clear that no aliens have voted in elections since at least 1928.[98]

In any event, this case presents no need to resolve the conflicting views on the voting rights of aliens. Regardless of the enfranchisement of aliens in general, it appears that the Framers would have had grave concern about *criminal* aliens in particular. As Professor Gerald Neuman has explained, "Outrage over foreign criminals is a recurrent theme of immigration policy."[99] Professor Neuman has helpfully collected examples from around the time of the drafting of the Constitution.[100] As he observes, the practice of the British government of shipping felons to the colonies as indentured servants prompted numerous protests, including Benjamin Franklin's idea of shipping rattlesnakes to Britain in return.[101] Several colonies attempted to pass legislation barring the overseas transportation of felons, only to see the British government veto their efforts. The Revolutionary War then obstructed penal transportation to this country. After the War, Britain has only limited success in transporting convicts to America (which lead it to set up an alternative—the penal colony at Botany Bay in Australia).[102] At this time, the states began passing legislation to ensure that penal transportation would not be re-

**92.** GERALD L. NEUMAN, STRANGERS TO THE CONSTITUTION: IMMIGRANTS, BORDERS, AND FUNDAMENTAL LAW 63–71 (1996).

**93.** *See id.* at 64–65.

**94.** *Id.* at 68 (citing *Minor v. Happersett,* 21 Wall. 162, 22 L.Ed. 627 (1875)).

**95.** Gerald M. Rosberg, *Aliens and Equal Protection: Why Not the Right to Vote?*, 77 MICH. L.REV. 1092, 1096 (1977).

**96.** *Id.* at 1097.

**97.** Neuman, *supra*, at 65–66; Rosberg, *supra*, at 1097–98.

**98.** Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 AM. POL. SCI. REV. 114 (1931).

**99.** GERALD L. NEUMAN, STRANGERS TO THE CONSTITUTION: IMMIGRANTS, BORDERS, AND FUNDAMENTAL LAW (1996).

**100.** *Id.* at 21–22 (collecting the examples and supporting citations that are recounted in this opinion).

**101.** To the Printers of the Gazette (1751), in BENJAMIN FRANKLIN, THE AUTOBIOGRAPHY AND OTHER WRITINGS (Peter Snow ed.1982).

**102.** G. NEUMAN, *supra*, at 21.

instated. In 1787, for example, Georgia passed a statute providing that felons transported or banished from another state or a foreign country be arrested and removed beyond the limits of the state, not to return on penalty of death.[103]

In 1788, the Congress of the Confederation passed a resolution calling on the states to "pass laws for preventing the transportation of convicted malefactors from foreign countries into the United States." [104] Several states rapidly responded:

> Connecticut limited itself to Congress's recommendation by banning the introduction of convicts sentenced to transportation by a foreign country. Massachusetts, Pennsylvania, South Carolina, and Virginia more broadly prohibited the importation of persons who had ever been convicted of crime.... In later years, after the federal Constitution had taken effect, further states enacted similar legislation, and states that already had such legislation reenacted or amended their provisions. Maine, Maryland, New Jersey, New York and Rhode Island borrowed statutes from other states or devised their own.[105]

Congress ultimately ratified this approach in 1875, prohibiting convict immigration.[106] Such a provision remains in effect today.[107] It is also relevant to note that when Congress approved the Fourteenth Amendment, it specifically indicated that states were free to diminish voting rights of those involved in "rebellion or other crime." [108]

From all these facts, it is difficult to see how criminal aliens would have been considered part of or connected to the nation's political community. To the contrary, the historical materials suggest that the Framers were doing everything possible to exclude such persons from the national community. Against that backdrop, the court now turns to the facts of this particular case.

### 2. Esparza–Mendoza's Connections to this Country.

The defendant, Esparza–Mendoza, is a citizen of Mexico. In March 1996, he entered the United States illegally near San Ysidro, California, and never attempted to legalize his status. He found his way to Utah, where he became involved with illegal drugs. On April 19, 1999, he was convicted in Utah for possession of cocaine and sentenced to a term of imprisonment not to exceed five years. He was then notified that he would be removed from the United States. He was ordered removed and instructed not to return without prior approval, being specifically warned of the criminal consequences of illegally reentering. On May 22, 1999, he was deported "a foot" to Mexico. Three-and-a-half years later, on October 27, 2002, Esparza–Mendoza was found in West Jordan, Utah, as described in more detail above.

At the suppression hearing and in his brief following the hearing, Esparza–Mendoza choose not to introduce any evidence, including any evidence regarding his connection to this country.[109] Presumably this was because of legal restrictions that make it nearly impossible for previously removed alien felons to establish firm connections with this country. As the United

---

**103.** Act of Feb. 10, 1787, 1787 Ga. Acts. 40.

**104.** 13 J. of Cong. 105–06 (Sept. 16, 1788).

**105.** Act of Oct. 1788, 1788 Conn. Acts & Laws 368.

**106.** Act of Mar. 3, 1875, § 5, 18 Stat. 477.

**107.** 8 U.S.C. § 1182(a)(2).

**108.** U.S. Const. amend. XIV.

**109.** Tr. 2/3/03 at 41–42.

States has explained, an illegal alien cannot be lawfully employed in this country, and his employer is civilly and criminally liable for knowingly hiring or retaining him.[110] An illegal alien is not generally entitled to federal or state public benefits,[111] can be restricted from voting or running for office,[112] is restricted from serving on a jury,[113] and is not entitled to First Amendment rights.[114] An illegal alien may not lawfully possess firearms,[115] which arguably suggests that they are not part of "the people" whose rights to keep and bear arms is apparently protected in the Second Amendment. Finally, while the continuously present permanent resident alien is guaranteed due process when threatened with deportation,[116] the illegal alien is only entitled to a "fair hearing upon threat of deportation." [117]

Disabilities such as these derive from Congress's undoubted authority to exclude aliens from this country. The Constitution permits Congress "[t]o establish an uniform Rule of Naturalization" [118] That power is considerable. Just last month the Supreme Court reiterated that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." [119] Congress may, indeed, "exclude [an alien] in the first instance for whatever reason it sees fit," because "an alien obviously brings with him no constitutional rights." [120] The Court has cautioned that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." [121] Policies toward aliens "are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." [122] Finally, the Supreme Court has upheld state laws excluding aliens from certain categories of public employment, instructing:

> The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition *outside of this community*.[123]

**110.** *See* 8 U.S.C. § 1324a

**111.** *See* 8 U.S.C. § 1611, 1621.

**112.** *See Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978).

**113.** *See* 42 U.S.C. § 602(a)(33).

**114.** *See United States ex rel. Turner v. Williams*, 194 U.S. at 292, 24 S.Ct. 719.

**115.** *See* 18 U.S.C. § 922(g)(5).

**116.** *See Landon v. Plasencia*, 459 U.S. 21, 33, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

**117.** *See id.* at 32, 103 S.Ct. 321.

**118.** U.S. CONST., art. I, § 8, cl. 4.

**119.** *Demore*, 123 S.Ct. at 1716.

**120.** *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (Murphy, J., concurring).

**121.** *Demore*, 123 S.Ct. at 1716 (internal quotations omitted).

**122.** *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (footnote omitted). *Accord, Mathews v. Diaz*, 426 U.S. 67, 81 n. 17, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Kleindienst v. Mandel*, 408 U.S. 753, 765–67, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

**123.** *Cabell v. Chavez–Salido*, 454 U.S. 432, 439, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (emphasis added).

It is thus hard to see how Esparza–Mendoza has sufficient connection to this country to be regarded as one of "the People" to whom the Fourth Amendment extends. Indeed, Esparza–Mendoza will doubtlessly be deported when he is released from prison. He has managed to illegally enter Utah and, by virtue of that fact alone, he is entitled to those rights which follow from mere presence in this country. But he lacks entitlement to those rights which come from being a member of American society—including Fourth Amendment rights.

One final legal doctrine supports this conclusion: the doctrine that those illegally on property lack the right to raise Fourth Amendment challenges to searches of that property. In the leading case of *Rakas v. Illinois*,[124] the Supreme Court explicitly noted that society does not recognize as reasonable the privacy rights of a defendant whose presence at the scene of the search is "wrongful."[125] The Court offered two examples of persons who lacked legitimate expectations of privacy due to wrongful presence: a person present in a stolen automobile at the time of the search[126] and "[a] burglar plying his trade in a summer cabin during the off season."[127] Applying these examples, the Second Circuit has concluded that an escaped felon lacks a legitimate expectation of privacy in his automobile. In *United States v. Roy*,[128] the Circuit denied an escapee's motion to suppress because "[a]t the time of the search and seizure, [the escapee] was no more than a trespasser on society."[129] Of course, precisely the same

thing can be said about Esparza–Mendoza here—he is a trespasser in this country.

For all these reasons, it appears that previously deported alien felons, such as Esparza–Mendoza, are not covered by the Fourth Amendment. In reaching this conclusion, the court has made a categorical determination about previously deported aliens. In other words, an individual previously deported alien felon is not free to argue that, in his particular case, he possesses a sufficient connection to this country to receive Fourth Amendment coverage (unless, of course, he could prove he was in this country lawfully). Any other determination would reward unlawful behavior. It would be perverse to give greater constitutional rights to those aliens who would have most flagrantly flouted the law by unlawfully returning to the United States for the longest periods of time. Therefore, it appears that all previously deported alien felons stand outside "the People" covered by the Fourth Amendment.

### D. Policy Considerations.

Before finally reaching a conclusion, the court will consider one last objection raised by Esparza–Mendoza. He contends that, if this court excludes him from Fourth Amendment protection, "police officers would go unchecked in their interactions with suspected illegal aliens."[130] It is unclear to what extent this court should let policy considerations dictate its interpretation of constitutional provisions. Because of the importance of preventing po-

---

124. 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

125. *Id.* at 141 n. 9, 99 S.Ct. 421.

126. *See id.*

127. *Id.* at 143 n. 12, 99 S.Ct. 421.

128. 734 F.2d 108 (2nd Cir.1984).

129. *Id.* at 111.

130. Defendant's Memo. in Support of Motion to Suppress at 6.

lice misconduct, however, the court will give this concern full consideration.

The defendant's argument is overstated. First of all, the Fourth Amendment will continue to have significant restraining effect even if its does not cover previously deported felons. Frequently, police officers will not know the precise immigration status of the person they are investigating until after taking actions subject to Fourth Amendment scrutiny. This case provides a convenient illustration. When Officer Cook briefly detained Esparza–Mendoza to investigate his identity, she did not know whether he was a citizen, a lawfully-present alien, or an illegal alien—much less, a previously removed alien felon. In the fact of this uncertainty, she would presumably follow the standards applicable to search and seizures of citizens, since she would be (among other things) potentially subject to civil suit for violating a citizens' Fourth Amendment rights.[131] Indeed, as a peace officer in the state of Utah, she would potentially be subject to criminal sanctions for unlawful detention and criminal trespass if she deliberately violated a citizen's rights.[132]

Even where police officers realize they are investigating a previously removed alien felon, however, the Fourth Amendment is not the sole constitutional restraint on police activity. The Fifth Amendment guarantees all "persons" protection against deprivations of life, liberty, or property without due process of law. Because of its broader language—protection of all "persons" rather than "the people"—it appears that Fifth Amendment due process requirements protect all within America's borders, even previously removed alien felons. *Verdugo–Urquidez* itself suggested this conclusion, when it noted the contrasting language between the Fourth and Fifth Amendment.[133] Moreover, as long ago as 1896, the Supreme Court stated directly that "all persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth Amendment], and ... even aliens shall not be ... deprived of life, liberty or property without due process of law." [134]

Due process requirements provide protection against abusive police actions. The Supreme Court has held that the requirements "guarantee more than fair process, and ... cover a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." [135] As explicated in a series of decisions starting in 1952, due process forbids police action "that shocks the conscience" and violates the "decencies of civilized conduct." [136] To be sure, the protections of the Fifth Amendment are more limited than those of the Fourth Amendment. In this case, for instance, while the short detention of Esparza–Mendoza violated the Fourth Amendment, it would in no way rise to the shocks-the-conscience level required to violate due process limitations. But the point remains that, even in the absence of Fourth Amendment restraints on law enforcement officers, previously removed alien felons like Esparza–Mendoza will have protections against abusive police actions.

---

131. *See* 42 U.S.C. § 1983.

132. Utah Code Ann. §§ 76–5–401; 76–6–206.

133. 494 U.S. at 265–66, 110 S.Ct. 1056.

134. *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

135. *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

136. *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

Finally, any assessment of the competing policy interests would be incomplete if it failed to consider the costs of extending the Fourth Amendment and its exclusionary rule component to cover claims by deported felons like Esparza–Mendoza. As the Supreme Court has recently noted, Congress has determined that criminal aliens pose special risks to society.[137] They have particularly high rates of recidivism.[138] This led Congress to streamline deportation and other procedures to insure effective apprehension and deportation of criminal aliens.[139] But deportation has had little effect because it "is too often perceived by criminal aliens as an inconvenience, perhaps even a blessing, providing an opportunity for a brief visit with friends and family before returning to the United States in a matter of days or even hours."[140] Therefore, Congress has adopted stiff criminal penalties for illegal reentry, particularly illegal reentry by previously removed alien felons. This court is not entitled to second-guess the congressional determination that, to combat the problems posed by criminal aliens, serious punishment is required.

Extension of the Fourth Amendment and its exclusionary rule to previously removed criminal aliens has the potential to interfere with the effectiveness of criminal sanctions. It is well known that successful motions to suppress "interfere[ ] with the criminal justice system's truth-finding function" and permit "some guilty defendants [to] go free or receive reduced sentences as a result of favorable plea bargains."[141] Moreover, court time spent

resolving motions to suppress can be considerable. Finally, the Supreme Court has cautioned that "[i]ndiscriminate application of the exclusionary rule, ... may well generate disrespect for the law and administration of justice."[142] Application of the rule here might produce such disrespect, as law-abiding citizens (and lawfully resident aliens, for that matter) may well wonder why someone who has committed crimes in this country, been expelled for them, and then illegally reentered is entitled to the protections that belong to "the People" of this nation.

In sum, the court cannot conclude that policy considerations should lead it to construe the Fourth Amendment as extending to previously removed alien felons. Therefore, the court agrees with the position of the United States and holds that Esparza–Mendoza—as a previously deported felon—lacks sufficient connection to this country to assert a Fourth Amendment suppression claim. In reaching this conclusion, the court is not determining whether illegal aliens who have not been deported likewise lack of a sufficient connection. The case law appears to recognize an ascending scale of rights for aliens.[143] Whether illegal aliens who have not previously been deported are distinguishable from alien felons who have been deported is a question that can await another day.

### CONCLUSION

Because Esparza–Mendoza lacks a substantial sufficient connection to this coun-

---

137. *Demore,* 123 S.Ct. at 1714–1717.

138. *Zadvydas v. Davis,* 533 U.S. 678, 713–714, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (cited in *Demore,* 123 S.Ct. at 1715 (Kennedy, J. dissenting)).

139. *See generally Demore,* 123 S.Ct. at 1715–16.

140. S.Rep. No. 104–48 at 2 (1995).

141. *United States v. Leon,* 468 U.S. 897, 907, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

142. *Id.* at 908, 104 S.Ct. 3405 (internal quotations omitted).

143. *See Johnson v. Eisentrager,* 339 U.S. 763, 770, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

try, his motion for suppression of evidence under the Fourth Amendment (# 11–1) is DENIED.

SO ORDERED.