**UNITED STATES of America, Appellee,**

**v.**

**Rita L. WILLIAMS, Appellant.**

**No. 82–2263.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 18, 1983.

Decided Aug. 9, 1983.

Rehearing and Rehearing En Banc Denied Sept. 15, 1983.

---

Christopher C. Iliff, Bruce Campbell, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for appellant.

Robert G. Ulrich, U.S. Atty., J. Whitfield Moody, Asst. U.S. Atty., Kansas City, Mo., for appellee.

American Civil Liberties Union of Western Missouri by Floyd R. Finch, Jr., Blue Springs, Mo., for amicus curiae.

Before HEANEY, McMILLIAN and ARNOLD, Circuit Judges.

HEANEY, Circuit Judge.

Rita Williams appeals from her conviction for aiding and abetting a bank robbery in violation of 18 U.S.C. §§ 2 and 2113(a) & (d). Williams waived her right to a jury trial, and the district court tried the case on the basis of stipulated facts. On October 5, 1982, the district court found Williams guilty and sentenced her to a study sentence pursuant to 18 U.S.C. § 4205. We affirm the district court's judgment.

## I.

## FACTS

On June 25, 1982, three black males entered the United Missouri Bank South in Kansas City, Missouri, and robbed it of approximately $7,100. The three men fled from the scene of the crime in a red 1970 Ford station wagon containing two other black males.

About one-half hour before the robbery, the Kansas City police radio broadcast reported that a red Ford station wagon had been stolen at gunpoint by two black males wearing dark blue sweat suits. About twenty minutes later, Kansas City Police Officer Francey Chapman, who had heard the stolen vehicle report, noticed a black male and two black females in a 1971 white and gold Buick automobile in a shopping center parking lot approximately eight blocks north of the United Missouri Bank South. Officer Chapman observed that after the male—who was dressed in dark clothing—exited from the Buick, the two women drove away.

Less than ten minutes later, the police radio broadcast reported the United Missouri Bank South robbery and identified the suspect vehicle as a red Ford station wagon. Officer Chapman, who had remained in the shopping center parking lot, immediately began to drive toward the United Missouri Bank South until she spotted the white and gold Buick with two black women proceeding in a direction away from the bank. As the Buick turned east, Officer Chapman began to follow it. The police radio broadcast then reported that the suspect vehicle—the red Ford station wagon—was occupied by five black males. Shortly thereafter, Chapman stopped the Buick. She ordered the two women—Rita Williams, the driver, and Nadine Farris—out of the car and frisked them. Upon feeling a hard object under Farris's blouse, Chapman removed it and discovered a large roll of money. Chapman then searched the vehicle and found two zipped bags. She opened them, and found several handguns in one and a bundle of loose cash in the other. Chapman then directed the backup officer to place the two women under arrest and advise them of their constitutional rights, which he did. Subsequently, Williams confessed her involvement in the bank robbery during a custodial interrogation.

## II.

## DISCUSSION

Prior to her trial, Williams moved to suppress her confession and the evidence seized from her automobile[1] on the ground that Officer Chapman's warrantless search and seizure violated the fourth amendment.

The district court denied this motion, and Williams' subsequent motion for reconsideration. We review the district court's factual findings and determinations regarding the existence of circumstances justifying the warrantless seizure and search of Williams under the clearly erroneous standard. *E.g., United States v. McGlynn,* 671 F.2d 1140, 1143 (8th Cir.1982).

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court first recognized an exception to the requirement that fourth amendment seizures of persons must be based upon probable cause. It is now settled that under certain limited circumstances, law enforcement officers, without a warrant, may stop a motor vehicle for investigative purposes. Such a stop is permissible only when the officers are aware of particularized and articulable objective facts which, taken together with rational inferences from those facts, reasonably warrant the suspicion that the person stopped is, or is about to be, engaged in criminal activity. *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 694–695, 66 L.Ed.2d 621 (1981); *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *United States v. Martin,* 706 F.2d 263 at 265 (8th Cir.1983).

The district court found that Officer Chapman's stop of Williams' automobile and her frisk of the occupants was a valid investigatory seizure. Williams argues that the district court erred because the vehicle stop was impermissibly based on the race of the automobile's occupants rather than a reasonable suspicion that they were en-

1. The government urges that Williams lacks standing to assert her fourth amendment claims because the automobile she was driving was owned by Dorletha Godley and, thus, Williams allegedly had no legitimate expectation of privacy in the automobile. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The district court rejected this claim. It found that Godley and Terence Swinney, who is Williams' nephew, were cohabitants and that Swinney, with Godley's knowledge, occasionally permitted Williams to use the automobile. It further found that Swinney gave Williams permission to use the automobile on the day of the bank robbery, and that this approval provided Williams with a sufficient expectation of privacy in the vehicle to have standing in this case to assert her fourth amendment claims. The district court's findings are not clearly erroneous, and they are affirmed. *See United States v. Portillo,* 633 F.2d 1313, 1317 (9th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1764, 68 L.Ed.2d 241 (1981) (defendant, who had both permission to use his friend's automobile and keys to operate it, had standing to contest search of trunk). For convenience in this opinion, we occasionally will refer to the white and gold Buick as Williams' automobile.

gaged in criminal activity.[2] The court below rejected this contention, finding that Chapman did not rely upon the race of Williams and Farris to justify the vehicle stop, and that Chapman's conduct was based upon reasonable suspicion.

In *United States v. Clay,* 640 F.2d 157, 159–160 (8th Cir.1981), this Court stated:

> Police cannot have grounds for suspicion based solely on the race of the suspect. * * * Although color of skin is an identifying factor, * * * *this court has consistently rejected the use of race in combination with other factors to justify investigative searches and seizures.* * * * In the case at bar, like *Nicholas,* "we think that, at best, the police were acting upon a generalized suspicion that any black person ... might be engaged in criminal activity." [Emphasis added; citations and footnote omitted.]

We reaffirm our commitment to these principles. Nonetheless, after carefully reviewing the record here, we cannot say that the district court clearly erred in finding that Officer Chapman did not base her stop of Williams' vehicle on the race of the automobile's occupants. Chapman testified in the proceedings below that it was "rare" for black persons to be in the predominately white neighborhood where the robbery occurred. Read as a whole, however, the record supports the district court's findings that Chapman only considered the race of the automobile occupants as an identifying factor and that she based her conduct upon a reasonable suspicion that Williams and Farris were engaged in criminal activity.

Less than ten minutes before the bank robbery was reported, Officer Chapman observed a parked white and gold Buick occu- pied by two black women and one black man in a shopping center parking lot. Chapman noticed that the male, who was exiting from the automobile, had black gloves in his back pocket and was wearing dark blue clothing which the officer considered "unusual dress for * * * a June day" because "it was warm and he was dressed very warmly." At this time, Chapman was aware that approximately one-half hour earlier two armed black men, dressed in dark blue sweat suits, had stolen a red Ford station wagon in a park less than five miles from the shopping center.

Shortly after Officer Chapman observed the Buick in the parking lot, the police radio broadcast reported that there had been an armed robbery at the Union Missouri Bank South, and directed police officers to be "[o]n the lookout for a red Ford station wagon." It was reasonable for Chapman to infer that the Ford automobile was the bank robbery getaway car and that it was the same one which had been stolen shortly before by two black men dressed similarly to the black male she had seen exiting from the white and gold Buick. When Chapman heard this report, she began to drive toward the bank, which is located about eight blocks south of the shopping center where she was parked. When Chapman spotted the white and gold Buick traveling in a direction away from the bank, she turned to follow it. Chapman, following the automobile as it turned east and then south, noticed that it contained the two black women but not the black male dressed in dark clothing that she had seen earlier. She also observed that the Buick's driver, Williams, reduced her speed and apparently signaled for a right turn on several occasions with-

---

**2.** Williams also contends that the stop of her car in this case constituted a full arrest rather than an investigatory or *Terry* stop, and thus Officer Chapman was required to have probable cause—rather than a reasonable suspicion—for her actions. The determination of whether an "arrest" has occurred for fourth amendment purposes does not depend on whether the police officers have announced that they are placing an individual under arrest. *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979). If the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases, an arrest occurred. *Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229, 241 (1983). After reviewing the record in this case, however, we cannot say that the district court clearly erred in finding that Chapman's initial stop and frisk was an investigatory stop rather than an arrest.

out turning:[3] such a turn would have taken the automobile back toward the bank or an area with numerous parking places. Shortly thereafter, the police radio broadcast reported that the suspect vehicle—the red Ford station wagon—was occupied by five black males and that it was the automobile which had been stolen shortly before the bank robbery.

On the basis of these circumstances, Officer Chapman stopped the Williams' vehicle. We agree with the district court that this stop was a valid investigatory seizure based upon particularized and articulable objective facts which reasonably warranted Chapman's suspicion that the occupants of the vehicle were involved in the robbery of the United Missouri Bank South.

Williams alternatively argues that even if she was subjected to a valid investigatory stop, Officer Chapman impermissibly extended that stop by searching the automobile without probable cause after she had frisked Williams and Farris.[4]

[redacted] In *Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1325–1326, 75 L.Ed.2d 229, 238 (1983), the Supreme Court emphasized that

> [t]he predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. * * * [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. * * * It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. [Emphasis added; citations omitted.]

Any further detention or search beyond that necessary to effectuate the investigatory purpose of the stop must be based on consent or probable cause. *See id.* at ——, 103 S.Ct. at 1325–1329, 75 L.Ed.2d at 238–243; *Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256.

[redacted] In *United States v. Ross,* 456 U.S. 798, 810–824, 102 S.Ct. 2157, 2165–2172, 72 L.Ed.2d 572, 584–593 (1982), the Supreme Court held that if law enforcement officials have legitimately stopped a motor vehicle and they have probable cause to believe that the vehicle contains contraband, they may conduct a warrantless search of the automobile and any containers in it in which the contraband might reasonably be found. The court below found that after Officer Chapman had legitimately stopped Williams' vehicle and frisked its occupants, she had probable cause to search the automobile and the two zipped bags she found inside.[5] This finding is not clearly erroneous.

If Officer Chapman's frisk of Williams and Farris had produced nothing, we might

3. The police subsequently discovered that the brake lights in Williams' automobile were malfunctioning, and thus the defendant had been applying the brakes rather than signaling for right turns which she did not complete. Officer Chapman, of course, could not have known of this fact while she followed Williams' automobile, and thus her reliance upon it as another suspicious factor was reasonable.

4. Williams does not contend that Officer Chapman exceeded the permissible scope of an investigative seizure by ordering her out of her car and frisking her. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (upholding police officer's order to driver to get out of car and his subsequent frisk for weapons).

5. The Supreme Court recently held in *Michigan v. Long,* —— U.S. ——, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201, 1220 (1983), that when a police officer makes a legitimate investigatory stop of a person in an automobile, he or she may conduct a search for weapons in any compartment in the automobile in which a weapon may be placed or hidden "if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (Footnote and citation omitted). Because we agree that Officer Chapman had probable cause to search the two bags she found in Williams' automobile, we need not determine whether her investigation of the bags was a valid investigatory search for weapons.

agree with the defendant that the vehicle search was not based on probable cause and constituted an impermissible extension of the investigatory stop. When Chapman frisked Farris, however, the officer felt a "hard object" within her blouse. Chapman testified that she removed the object from Farris's brassiere because she believed "it could possibly be a knife or small hand-gun."[6] The object in fact was a large money roll. Although Farris's concealed possession of this substantial sum of money in other circumstances might not be significant, we cannot say in this case the district court clearly erred in finding that such possession shortly after a bank robbery, combined with the other suspicious circumstances that justified the initial stop of Williams' vehicle, created probable cause to believe that there was contraband in that vehicle. *See United States v. Martin, supra,* 706 F. 2d at 265 (information obtained by officers during *Terry* stop "escalated the factual basis from one permitting an investigatory stop to one warranting an arrest"). Accordingly, because Chapman based her search on probable cause, her warrantless search of Williams' vehicle and seizure of the contraband she found inside were constitutionally permissible.[7]

In summary, the district court did not clearly err in finding that Williams was not deprived of her fourth amendment rights when Officer Chapman made a warrantless investigatory stop of her vehicle and subsequently searched the automobile and seized the weapons and money found in it. Accordingly, the court properly denied Williams' motion to suppress the contraband seized from the vehicle and her subsequent confession. We affirm.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. As a preliminary matter I do not agree with the district

court's finding that the confrontation between the police and appellant was an investigatory stop and not an arrest. The government has conceded that the police did not have probable cause at the time of the confrontation. I would therefore hold that appellant's arrest was unlawful because it was not based upon probable cause. Assuming that the confrontation was an investigatory stop, I do not agree with the district court's finding that Officer Chapman had a reasonable suspicion, based upon objective facts, that appellant was engaged in criminal activity. In my opinion the record shows that Officer Chapman's suspicion was based almost entirely upon her observation of black persons in a predominantly white area and the inference that the presence of black persons in a predominantly white area was in itself suspicious. I would also suppress appellant's confession because the record shows no intervening or attenuating circumstances of any significance that broke the causal relationship between the investigatory stop and the confession. *See Dunaway v. New York,* 442 U.S. 200, 216–19, 99 S.Ct. 2248, 2258–60, 60 L.Ed.2d 824 (1979). Accordingly, I would reverse appellant's conviction.

Before discussing the reasons why I disagree with the district court's finding of reasonable suspicion, it should be clearly understood that I agree that Officer Chapman was acting in good faith. However, Officer Chapman's good faith and the fact that her suspicions ultimately proved to be correct are not relevant to the question whether Officer Chapman had a reasonable suspicion based upon objective facts at the time of the investigatory stop.

It is difficult to determine the exact sequence of events from the record. As further explained below, the critical informa-

---

**6.** The district court held that Officer Chapman's removal of the then unidentified object was a reasonable investigatory seizure. Williams does not challenge this holding on appeal.

**7.** Because we hold that Officer Chapman's warrantless search was valid under the automobile

exception to the fourth amendment warrant requirement, we need not reach the district court's alternative holding that Chapman conducted a permissible search incident to a lawful arrest which occurred after her initial stop and frisk.

tion which arguably connects the occupants of the Buick with the bank robbery was the police radio report that two black males, armed and dressed in blue sweatsuits, had stolen a red Ford stationwagon in a park about five miles away from the bank and supermarket. This stolen car report was broadcast at about 5:04 p.m. About half an hour later, at about 5:31 p.m., Officer Chapman was on patrol in the supermarket parking lot. She noticed a young black man, dressed in dark blue clothing with what looked like a pair of gloves in his pants pocket, talking to two black women sitting in an old gold and white Buick parked in the supermarket parking lot. At the plenary hearing Officer Chapman testified that she became suspicious because the car and its occupants "did not appear to belong" in the predominantly white area, because the young man's clothing was too warm for the hot summer weather and because the occupants "stared" at her as she drove past them in the patrol car. She watched the young man walk toward the supermarket and the Buick drive off the parking lot.

Several minutes later, at about 5:34 p.m., the police radio reported the bank alarm and the address of the bank. The police radio directed the police to be on the lookout for the red Ford stationwagon. However, the report did not identify the red Ford stationwagon as the bank robbery getaway car. Officer Chapman was driving toward the bank when she saw the Buick for the second time (at about 5:36 p.m.). The Buick was in the general vicinity of the bank and was leaving a white residential neighborhood. Officer Chapman testified that she thought this was suspicious because "it is very rare that a black family would live there or be there very often." Officer Chapman immediately radioed (at about 5:37 p.m.) that she was going to follow the Buick and stop it when she received backup assistance. While she was following the Buick, she noticed that the Buick repeatedly signalled for a turn without turning. About five minutes later, at about 5:41 p.m., the police radio reported that the bank had been robbed by five black

males and the getaway car was the red Ford stationwagon. It is not clear when Officer Chapman actually stopped the Buick, but she must have stopped the car before 5:48 p.m. because she radioed for a wagon and towtruck at that time.

It appears that Officer Chapman decided to stop the Buick *before* she knew the racial identity of the bank robbers or that the bank robbers used the red Ford stationwagon as the getaway car. As an initial matter I question the reasonableness of the inference that the red Ford stationwagon, which was stolen thirty minutes earlier five miles away and was last seen driving away from the general vicinity of the bank, was the getaway car. The first police radio report did not state that the red Ford was the getaway car; the description of the bank robbers and the getaway car was not broadcast until after Officer Chapman decided to stop the Buick. However, assuming that the red Ford stationwagon was the getaway car and that at least two of the bank robbers were black males dressed in blue sweatsuits, any connection between the two cars was extremely tenuous. The only objective fact connecting the two cars was the fact that the young man in the parking lot generally matched the description of the car thieves, that is, he was a black male dressed in blue.

In my opinion this "general match" was not sufficient. Officer Chapman did not describe the young man as wearing a blue sweatsuit. She described the young man's clothing as a dark blue long-sleeved shirt or jacket and matching pants that were too warm for summer weather. She testified that she thought he was dressed like a burglar (presumably because of the dark clothes). Officer Chapman did not state that she considered the young man as a possible car theft suspect or think that he was concealing a weapon. *Cf. United States v. Bull,* 565 F.2d 869 (4th Cir.1977) (jacket on warm summer night suggests possibility of concealed weapon), *cert. denied,* 435 U.S. 946, 98 S.Ct. 1531, 55 L.Ed.2d

545 (1978). Moreover, Officer Chapman did not report seeing in the parking lot another black male dressed in blue or the red Ford stationwagon. All she saw was a young black man dressed in dark blue clothes, not described as a sweatsuit, talking to two black women sitting in a gold and white Buick parked in the supermarket parking lot.

I attach little weight to Officer Chapman's statement that the occupants of the Buick "stared" at her as she drove past them in the patrol car. Not only is the "stare" a subjective assessment, it is of ambiguous significance. *See United States v. Mallides,* 473 F.2d 859, 861 & n. 4 (9th Cir.1973) (describing cases in which whether suspects stared or did not stare at passing police officers was considered suspicious).

What remains is Officer Chapman's observation of black persons in a predominantly white area and the inference that the presence of black persons in a predominantly white area was in itself suspicious. Race alone cannot support an investigatory stop; race may, however, be an identifying factor. *See United States v. Clay,* 640 F.2d 157, 159–60 (8th Cir.1981), *citing United States v. Nicholas,* 448 F.2d 622 (8th Cir. 1971); *United States v. Palmer,* 603 F.2d 1286 (8th Cir.1979). I do not agree that Officer Chapman only considered appellant's race as an identifying factor. *Compare United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982) (investigatory stop upheld where police already knew racial or ethnic identity of bank robbers and other objective factors). Even assuming that it was reasonable to infer that the stolen red Ford stationwagon would be used as the getaway car and that the bank robbers were black, that fact alone would not support an investigatory stop of black persons in the general vicinity of the bank within minutes of the robbery. The only additional factor connecting the two women in the Buick with the bank robbery was the young man in the blue clothing, and his connection with the bank robbery was premised only upon his matching the general description of the car thieves. I have already discussed why I think the young man in blue clothing is a very weak link between the Buick and the red Ford stationwagon. I think the weakness of the connection is further demonstrated by the fact that Officer Chapman became suspicious of the Buick and its occupants before the bank robbery and apparently independently of the car theft. At that time Officer Chapman did not use race as an identifying factor; she considered appellant's race, or more accurately the racial difference between appellant and the surrounding area, as suspicious in itself. Officer Chapman testified that she first became suspicious in part because it was very rare for blacks to be in the area and that her suspicions increased when she saw the Buick leaving a white residential area. Officer Chapman's use of race as a suspicion factor rather than an identifying factor becomes more apparent when one considers the time of the events (about 5:30 p.m. on Friday, June 25, 1982), the nature of the area (a commercial or business district in a metropolitan area), and the actions observed (sitting in a parking lot, driving down a street apparently not in violation of any traffic ordinances).

In sum, I cannot agree with the district court that Officer Chapman only considered appellant's race as an identifying factor. In my opinion Officer Chapman's suspicion was based almost entirely upon her observation of black persons in a predominantly white area.