UNITED STATES of America, Plaintiff,

v.

Samuel JETER and Brian Pinkney, Defendants.

No. 204CR00624PGC.

United States District Court, D. Utah, Central Division.

April 20, 2005.

L. Clark Donaldson, Utah Federal Defender Office, Lee C. Rasmussen, Rasmussen Miner & Associates, Salt Lake City, UT, for Defendants.

Veda M. Travis, US Attorney's Office, for Plaintiff.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS

CASSELL, District Judge.

This matter is before the court on defendants Samuel Jeter's and Brian Pinkney's motion to suppress evidence seized during the search of a car that they borrowed. The main issues are whether they have "standing" to challenge the search because the car was merely borrowed and whether the investigating officer obtained a voluntary consent to search. On the first issue, the court rejects the government's position that the defendants lack the ability to challenge the search. Pinkney's fiancée loaned the car to them for a week-long cross-country drive, giving them a legitimate expectation of privacy. That expectation does not disappear because of the fact—found in many criminal prosecutions—that they did not disclose their drug trafficking to her. On the second issue, the court agrees with the government that the officer obtained a valid consent to search, which quickly matured into probable cause when the officer discovered a concealed hidden compartment under the

car. Accordingly, the defendants' motion to suppress is denied.

## PROCEDURAL BACKGROUND

The court held an evidentiary hearing on the motion to suppress on December 9, 10, and 13, 2004. Following the hearing, the court first found that the defendants had standing to challenge the search of the car. But the court also denied the defendants' motion to suppress, finding that the officer obtained a valid consent to search their car and quickly located a hidden compartment that provided probable cause. The reasons for denying the motion were stated with specificity at the conclusion of the hearing. The court, however, invited all parties to file supplemental briefs on these issues. Briefs were filed, and on April 14, 2005, the court held further argument on the matter.

## FINDINGS OF FACTS

In addition to the findings made at the conclusion of the December 13, 2004 hearing, the court finds that the following facts have been established for purposes of determining the motion to suppress.

### Traffic Stop, Consent, and Search

On the morning of September 15, 2004, Officer Steve Salas of the Utah Highway Patrol conducted a traffic stop of a Ford Expedition driven by defendant Samuel Jeter and occupied by defendant Brian Pinkney As a six-year veteran of the Utah Highway Patrol, Officer Salas is assigned to the criminal interdiction team. As part of this special operations unit, Officer Salas has spent the last three years performing many traffic stops designed not only to enforce traffic laws but also to recover stolen vehicles, take impaired drivers off the road, and prevent drug trafficking. More specifically, Officer Salas described the main emphasis of the interdiction unit to be narcotics interdiction. As part of his training, Officer Salas took part in over one hundred hours of formal drug interdic-tion, pipeline interception training (which specializes in drug concealment methods), drug transportation techniques, and basic drug courier routes throughout the United States. During his three years as a member of the team, Officer Salas testified that he has conducted approximately 50 traffic stops in which he subsequently seized illegal narcotics and has assisted other officers in a similar number of stops. He is also skilled in "K–9" or dog searches. His dog was with him on the day in question.

Officer Salas stopped the car because it was speeding—his radar gun showed the Expedition traveling 71 miles per hour in a section of highway restricted to 60 miles per hour—and its window-tint was darker than the degree allowed by state and federal law. As Officer Salas approached the vehicle, he also noticed that the Expedition's two side rear windows were open approximately two inches, secured by a latch. This was unusual for a car traveling at high speeds, concluded Officer Salas, because of the noise an open window produces at highway speeds. As he came along side the Expedition, Officer Salas noticed an "overwhelming" odor of air freshener coming from the Expedition's interior. Looking into the vehicle, Officer Salas saw multiple air fresheners and incenses. Describing the fresheners, Officer Salas said that

the odor was so strong that I assumed it would almost make somebody nauseous being inside the vehicle with that many air fresheners. Again, it's not consistent to have multiple air fresheners that are different flavors.... Because of the number of air fresheners and because the back windows were open, I was assuming that they were trying to get some type of odor out of the vehicle. Based on my training and experience, I believed they were trying to cover an

odor, that's why they had the number of air fresheners they had.[1]

Other items of significance that Officer Salas testified that he could see from outside the vehicle included three cellular phones; Officer Salas found this odd because there were only two occupants in the Expedition.

While casually conversing with the defendants, Officer Salas requested Jeter's license, the Expedition's registration, and proof of insurance. Jeter provided all the requested information without reservation. Officer Salas continued to hold a conversation with the defendants, asking them miscellaneous questions, including from where they had come, what they had done while in Las Vegas, and at which hotel they stayed. During the conversation, Officer Salas testified that neither defendant would look at him, and "it appeared that they didn't want to answer the questions." Following brief further conversation, Officer Salas asked the driver, Jeter, to accompany him to his patrol car. Jeter agreed. While running a standard license and records check through the Highway Patrol dispatch officer, Officer Salas continued to ask Jeter general questions, including what Jeter did for a living. He then asked Pinkney similar questions while Jeter and Pinkney were separated. The defendants gave some ambiguous and conflicting statements that further raised Officer Salas's suspicion that criminal activity was afoot.

After questioning both defendants and obtaining a report from dispatch, Officer Salas asked Jeter if it would be okay to search the vehicle. According to Officer Salas, after receiving assurance that he would not use his drug-detection dog, Jeter agreed through Pinkney (who had borrowed the car from his fiancée). The defendants now dispute that consent was given. To support this claim, defense counsel submitted the videotape recorded from Officer Salas's patrol car that captured the traffic stop. As discussed at length during the hearing, there is a 16–minute gap where the stop is not recorded. Within this gap, the government alleges the defendants (through Pinkney) gave consent.

At the hearing, it was clearly established that the videotape that Officer Salas had been using throughout the morning of September 15, 2004, had simply run out, and it was not until 16–minutes later that Officer Salas replaced the expired tape with a newer one. Officer Salas's car was equipped with a warning device to alert him when the tape was drawing to the end, but he had intentionally disabled it to eliminate distracting feedback that came when he would speak into his personal microphone while sitting in his police cruiser. In disabling the warning device, Officer Salas did not act with bad intention. Instead, Officer Salas credibly testified as to the reasons for disabling the warning and as to being unaware that the tape had ended. (While the recorder was operating properly, the tape counter was apparently off by five-minutes.) When he did become aware of the problem, he immediately replaced the tape. Furthermore, upon doing so, Officer Salas promptly summarized what had taken place during the unrecorded gap.

The court finds, despite the gap in the tape, that Pinkney did orally consent to a search of the car, limited only by the requirement that Officer Salas not use his dog. There is no conflicting evidence on this point, as the defendants exercised their right not to testify. The consent was given orally, even though the officer had written consent forms in the car. After receiving consent to search the Expedition, Officer Salas instructed both defendants to

---

**1.** Transcript of Hearing on Motion to Suppress ("Tr."), p. 25–26.

stand two car-lengths away from the front of the Expedition while he searched. He placed his trained drug dog aside his patrol car (in a defensive position), but did not use the dog to conduct the search.

Officer Salas first did a visual inspection of the Expedition's exterior. As he looked beneath the Expedition, Officer Salas observed what he thought was an "aftermarket manufactured hidden compartment" located underneath the area where the rear seat was located. (The defense offered two expert witnesses who testified that they had difficulty seeing the compartment, but neither was as well trained as Officer Salas in detecting such things.) Not only did a hidden compartment exist, but Officer Salas noted that the compartment had been freshly undercoated with spray paint in what appeared to be an effort to conceal it:

> The compartment was freshly undercoated, had fresh black undercoat sprayed onto it. Looking underneath you could see that it was sprayed primarily around the compartment and on the hoses.... [T]he undercoating did not cover the entire undercarriage of the vehicle.[2]

Seeing the hidden compartment and the suspicious spray-paint prompted Officer Salas to inspect the Expedition's interior:

> At that point, I then walked around to the passenger side of the vehicle and opened the rear door ..., I lifted up the seat, and there was a molding, plastic molding which connects the carpet..., I removed that molding and then tried to lift up the carpet to gain access to that floor to see if there was a door to that compartment. While trying to pull up that carpet, I couldn't do so because the carpet was glued down.[3]

Officer Salas testified that in his experience, manufacturers do not glue down car-

pet in passenger cars. Furthermore, glued-down carpet was indicative of narcotics trafficking. At this point, Officer Salas requested assistance from another law enforcement officer.

After another officer arrived, Officer Salas proceeded to peel up the glue-down carpet with his hands. With the carpet no longer secured Officer Salas raised the carpet and could see the door to the hidden compartment, but was unable to open it with his hands. To open the door, Officer Salas used a screwdriver to pry open the corner of the compartment's door. Opening it enough to be able to see inside, Officer Salas observed a red cellophane wrapped package, which was later found to contain illegal substances. After Officer Salas found the package apparently containing illegal drugs, he quickly placed both defendants under arrest. He later determined that the hidden compartment contained approximately 15 kilos of cocaine.

### Permission to Use the Vehicle

Because the government has disputed the defendants' legal right to challenge the search of the Expedition, a few words about the defendants' permission to the use the car are appropriate. When the Expedition was stopped, its registered owner was Ms. Teanna Floyd of Canton, Ohio. She testified at the suppression hearing for the defense. As of the date of the hearing, she had completed payments on a loan on the Expedition.

Pinkney is Ms. Floyd's fiancée and is the father of her two children. Ms. Floyd testified that she gave Pinkney permission to take her Expedition to Las Vegas, Nevada, for the purpose of vacationing with Jeter. Specifically, she authorized both Pinkney and Jeter to drive her car from Ohio to Las Vegas, remain in Las Vegas

---

**2.** Tr., p. 47.

**3.** Tr., p. 48–49.

for approximately one week, then return in her car to Ohio. On cross-examination, the government established—and the court finds—that Ms. Floyd was never made aware that either Pinkney or Jeter would be using her Expedition to transport illegal substances. Moreover, the court finds that if Pinkney or Jeter would have affirmatively advised her of this fact, she would not have loaned them the car.

Ms. Floyd further explained that she and Pinkney often traded cars and that she never asked Pinkney to explain in detail his plans, other than to explain where he was planning on driving and for what general purpose he intended to use the vehicle. Pinkney assisted Ms. Floyd by paying the insurance for the Expedition. While vacationing in Las Vegas, Pinkney telephoned Ms. Floyd every other day to check on his children and fiancée. Both Pinkney and Jeter had their personal belongings in the Expedition while returning from Las Vegas.

## DISCUSSION

Defendants Pinkney and Jeter filed a timely motion to suppress under the Fourth Amendment, seeking to suppress evidence seized during the traffic stop, primarily the large amount of cocaine that was discovered. Their argument is that no consent was given and that there was no probable cause to pry up the Expedition's carpet. They also argue that even if consent was given, Officer Salas exceeded the scope of that consent by peeling up the glued-down carpet.

The government responds that the defendants lack the right to challenge the search of their borrowed car and that Officer Salas obtained a valid consent to search the car that quickly produced probable cause to search the vehicle.

The court rejects the government's arguments that the defendants had no interest infringed in the search of the Expedition that they had properly borrowed. More important, however, the court rejects the defendants' motion to suppress, finding that the drugs were discovered via a valid consent search that revealed the existence of a hidden compartment.

### Interests of the Defendant ("Standing")

■ The government initially argues that the defendants lack "standing" to raise Fourth Amendment objections to the search of the Expedition. The government appears to agree that if two persons obtain permission from a car's owner to borrow that car for a week-long, cross-country trip, they have sufficient connection to the car to challenge the search. The government takes the novel position, however, that because the defendants obtained this permission by failing to disclose their plan to use the car for drug trafficking and because Ms. Floyd would not have loaned them the car if they had known that, they somehow forfeited their right to borrow the car and thus lack the ability to now challenge the search.

The government, joined by the defendants, has characterized this issue as one of "standing." Such terminology is understandable, as it is frequently used by criminal law practitioners. However, as explained in a prior decision issued by this court, "standing" is not the correct terminology for the dispute at issue.[4] "The Supreme Court has repeatedly insisted that we not use the term 'standing' as shorthand for a defendant's capacity to challenge a search."[5] Instead, this issue

4. *United States v. Esparza–Mendoza,* 265 F.Supp.2d 1254, 1258 (D.Utah 2003) (*aff'd* on different grounds 386 F.2d 953 (10th Cir. 1967).

5. *Id.* (quoting *United States v. Higgins,* 282 F.3d 1261, 1270 n. 3 (10th Cir.2002); *see also United States v. Gordon,* 168 F.3d 1222, 1225 n. 2 (10th Cir.1999), *cert. denied,* 527 U.S.

is to be described as "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."[6] In following the Supreme Court's instructions, the court will proceed by "determin[ing] the interests the defendant might argue have been infringed."[7]

■ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[8] A defendant cannot obtain suppression of evidence under the Fourth Amendment unless the seizure violated his *own* constitutional right.[9] "[T]he defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party."[10]

■ The government's position on this issue, while well-argued by capable counsel, is ill-founded. Generally, a defendant can challenge a search of a car where he has permission of the owner to use the vehicle. As the Tenth Circuit has explained in *United States v. Rubio–Rivera:*

The standing [sic] inquiry focuses on reasonable expectations, hence, a defendant is not required to produce legal documentation showing a chain of lawful custody from the registered owner to himself.... Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.[11]

The Tenth Circuit decision in *Rubio–Rivera* is in line with a number of other circuit opinions in holding that a defendant who has permission to use a car possesses (in the absence of any other contrary evidence) a reasonable expectation of privacy sufficient to challenge any search.[12] In a Third Circuit decision,[13] the defendant (Baker) was arrested while driving a car registered in someone else's name. In concluding that Baker could assert his own expectation of privacy, the Third Circuit explained that "[a]lthough he did not own

---

1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999).

6. *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

7. *Esparza–Mendoza,* 265 F.Supp.2d at 1258.

8. U.S. Const. amend. IV.

9. *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

10. *Id.* (emphasis in original).

11. *United States v. Rubio–Rivera,* 917 F.2d 1271, 1275 (10th Cir.1990) (internal citations omitted).

12. *See United States v. Garcia,* 897 F.2d 1413, 1418 (7th Cir.1990) (where defendant claimed to have borrowed truck under vague arrangement, he had standing given that government failed to disprove that the truck "was not

being used with the permission of the owner"); *United States v. Miller,* 821 F.2d 546, 548–49 (11th Cir.1987) (defendant had standing to challenge search of car borrowed from a friend); *United States v. Portillo,* 633 F.2d 1313, 1317 (9th Cir.1980) (same), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *see also United States v. Rose,* 731 F.2d 1337, 1343 (8th Cir.1984) (same, car borrowed from sister), *cert. denied,* 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984); *United States v. Griffin,* 729 F.2d 475, 483 (7th Cir.) (same, car borrowed from brother), *cert. denied,* 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *United States v. Williams,* 714 F.2d 777, 779 n. 2 (8th Cir.1983) (same, car borrowed from nephew's girlfriend); *United States v. Posey,* 663 F.2d 37, 40–41 (7th Cir.1981) (same, car borrowed from wife), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982).

13. *United States v. Baker,* 221 F.3d 438, 442 (3rd Cir.2000).

the car, he had substantial control over it insofar as he had borrowed it from a friend and had been driving it for four to six weeks .... [,] carried the keys to the car .... [,] and there was no evidence that the car was stolen or that Baker knowingly possessed a stolen car." [14] The Third Circuit even rejected the argument that the defendant lacked the ability to challenge the search because the registered owner, from whom the defendant claimed to have rightly borrowed the car, denied ownership.[15] The Seventh Circuit, too, has held that a driver who borrowed a car, but was unable to provide the last name of the owner, nonetheless could object to the search because "[i]f an individual has the owner's permission to use property, society surely recognizes this as reasonable." [16] And finally, in *United States v. Cooper*, the Eleventh Circuit found that despite driving a rental car with an expired rental agreement, the driver nonetheless had a reasonable expectation of privacy sufficient to justify his bringing the motion to suppress.[17] In that case, defendant Cooper rented a car through a contract that required him to return it by a certain date; when he failed to return the car as scheduled, the contract expired and he was in unlawful possession of the car.[18] Four days after the rental contract expired, a highway patrol officer pulled Cooper over for a traffic violation, obtained a consent search, and discovered illegal drugs.[19] In finding that Cooper could contest the search, the court held that, among other things, because the rental car agency had not reported the car stolen or otherwise attempted to enforce any of its contractual or legal rights against Cooper prior to the traffic stop, society was "prepared to accept as reasonable Cooper's expectation of privacy in the overdue rental car and, therefore, he ha[d] standing to challenge law enforcement's search...." [20] All of these cases, and many other like them,[21] demonstrate that a person who borrows a car with the permission of the owner has, in the absence of other evidence, a reasonable expectation of privacy in the car sufficient to challenge a search of it.

Applying this test here, both defendants clearly appear to have a reasonable expectation of privacy in the car. Ms. Floyd's testimony clearly indicates both had her permission to use her Expedition for a cross-country trip:

---

**14.** *Id.* at 442–43.

**15.** *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1179 (10th Cir.1995).

**16.** *Garcia*, 897 F.2d at 1418.

**17.** *See* 133 F.3d 1394, 1395–96 (11th Cir. 1998).

**18.** *Id.*

**19.** *Id.* at 1396.

**20.** *Id.* at 1401–02.

**21.** *See United States v. Garcia*, 897 F.2d 1413, 1418 (7th Cir.1990) (where defendant claimed to have borrowed truck under vague arrangement, he had standing given that government failed to disprove that the truck "was not being used with the permission of the owner"); *United States v. Miller*, 821 F.2d 546, 548–49 (11th Cir.1987) (defendant had standing to challenge search of car borrowed from a friend); *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir.1980) (same), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981); *see also United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir.1984) (same, car borrowed from sister), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984); *United States v. Griffin*, 729 F.2d 475, 483 (7th Cir.) (same, car borrowed from brother), *cert. denied*, 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *United States v. Williams*, 714 F.2d 777, 779 n. 2 (8th Cir.1983) (same, car borrowed from nephew's girlfriend); *United States v. Posey*, 663 F.2d 37, 40–41 (7th Cir.1981) (same, car borrowed from wife), *cert. denied*, 455 U.S. 959, 102 S.Ct. 1473, 71 L.Ed.2d 679 (1982).

Q: And did you loan [the Expedition] to your boyfriend Brian Pinkney and his friend Sam Jeter to take?

A: Yes.

Q: Okay. And did you expressly give both of them permission to borrow the vehicle and to use it?

A: Yes.[22]

Despite what appears to be a clearly resolved issue, the United States contends that Ms. Floyd's permission to use the car was obtained under false pretenses that invalidated the permission. Specifically, the government argues that in light of Ms. Floyd's testimony that she would not have lent her Expedition to the defendants had she known they would use it to transport illegal drugs, the defendants obtained access to the Expedition under false pretenses and therefore were not in rightful possession of it. As a consequence, continues the government, the defendants did not have a reasonable expectation of privacy sufficient to justify their assertion of their constitutional protections.

While the government's argument is very creative, it is ultimately unpersuasive. If accepted, the government's expansive position would bar defendants from challenging a wide range of government searches. In cases where a defendant has obtained access to property only through the permission of another, the government will always be able to extract testimony that this permission was given without knowledge of illegal activities. After all, if the lender loaned property with the knowl-edge it would be used for illegal activities, he would likely be committing a criminal offense—either aiding and abetting that activity or conspiring to commit that activi-ty.[23]

The view that a restriction by a lender is sufficient to deprive a defendant of the ability to challenge a search would effec-tively overrule many of the cases discussed previously. For starters, the position con-flicts with *United States v. Cooper*, which held that the violation of a rental car agreement by failure to return the car in a timely fashion did not eliminate a defen-dant's reasonable expectation of privacy. If the violation by Cooper of the *actual* restrictions in the rental car contract was not sufficient to eliminate an expectation of privacy, *a fortiori* violation by the defen-dants of the *implied* restriction in Ms. Floyd's loan of the car would not do so.

But the damage to existing caselaw would not be limited to such cases as *Cooper* involving simply failure to return a rental car on time. If the government's position were accepted, *no defendant* would ever be able to challenge a search of a rental car. Rental car contracts typically contain boilerplate language that the car is not to be used for illegal purposes.[24] If the government is correct, then violation of that provision (by, for example, carrying drugs in the car) would deprive a defen-dant of challenging the search, effectively overruling at least the result in dozens of cases that hold that a defendant validly in possession of a rental car does indeed have the ability to challenge a search.[25]

22. Tr. p. 83.

23. *See* 18 U.S.C. §§ 2, 371.

24. *See, e.g., United States v. Boruff,* 909 F.2d 111, 117 (5th Cir.1990) (agreement expressly forbade use of rental car for illegal purposes).

25. *See, e.g., United States v. Brown,* 2000 WL 1290431 (D.Kan. Aug.30, 2000); *United States v. Smith,* 263 F.3d 571, 582 (6th Cir.2001); *United States v. Riazco,* 91 F.3d 752 (5th Cir. 1996), *cert. denied,* 519 U.S. 1000, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996); *United States v. Kye Soo Lee,* 898 F.2d 1034 (5th Cir.1990); *United States v. Walker,* 237 F.3d 845 (7th Cir.2001); *United States v. Henderson,* 241 F.3d 638 (9th Cir.2000), *cert. denied,* 532 U.S. 986, 121 S.Ct. 1634, 149 L.Ed.2d 494 (2001).

The implications of the government's position would not be limited simply to cars. In many other situations, a defendant is in possession of property by permission of another. In all of these cases, the government could argue that possession was obtained through false pretenses and therefore the defendant could not challenge a search. For example, hotel rooms and apartments are commonly leased, presumably with contracts forbidding committing crimes within them. If a simple showing of a contractual violation is sufficient to deny the ability to challenge a search, then the manifold cases reviewing such challenges [26] would no longer be valid. Indeed, even many *homeowners* might lack the ability to challenge police searches. In this country, most homes are purchased through a mortgage; mortgage agreements may explicitly or implicitly forbid illegal activities. A homeowner with a mortgage might find that he could not challenge a search because he obtained his home under "false pretenses" by failing to disclose to the mortgage lender the intent to engage in illegal conduct in the home.

The situation of property being obtained by a defendant under false pretenses should be distinguished from that in which a defendant never legitimately obtains property. For example, in *United States v. Gordon*, the defendant rented a car under a false identification, a false driver's license, and a false debit card.[27]

The District Court for the Eastern District of Virginia concluded that the defendant did not have standing to challenge the search of the rental car because the defendant never had a legitimate right to control the rental car, had no reasonable subjective expectation of privacy, and society would not recognize as reasonable an expectation of privacy in a vehicle obtained by fraud.[28] Similarly, in *United States v. Boruff*,[29] the defendant arranged to have his girlfriend rent a car for him to use in carrying out a drug smuggling operation.[30] She did so, and the rental agreement she signed provided (in addition to the boilerplate prohibition of use for illegal activities) that only she could drive the car.[31] The defendant then drove the rental car to pickup a large shipment of marijuana.[32] While returning home, the defendant was pulled over, the rental car was searched, and he was arrested.[33] In concluding he could not challenge the search, the Fifth Circuit explained that the defendant had no legitimate expectation of privacy in the rental car because "[u]nder the express terms of the rental agreement, [his girlfriend] was the only legal operator of the vehicle .... [and she] had no authority to give control of the car to [the defendant]."[34] (The court also found important the fact that the rental agreement "expressly forbade any use of the vehicle for illegal purposes,"[35] although the precise import of this provision was never explained.)

26. *See, e.g., United States v. Anthon*, 648 F.2d 669 (10th Cir.1981) (warrantless search of hotel room without consent violated Fourth Amendment); *United States v. Carr*, 939 F.2d 1442, 1446 (10th Cir.1991) (defendant had standing to assert constitutional violation when his hotel room was searched); *United States v. Thomas*, 372 F.3d 1173 (10th Cir. 2004) (defendant had standing to bring Fourth Amendment challenge to police entry into and search of apartment).

27. *See* 65 F.Supp.2d 365 (E.D.Va.1999).

28. *Id.* at 369 (applying three-part test set forth in *United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir.1986)).

29. *See* 909 F.2d 111 (5th Cir.1990).

30. *Id.* at 113–14.

31. *Id.*

32. *Id.* at 114.

33. *Id.*

34. *Id.*

35. *Id.*

*Gordon* and *Boruff* are distinguishable from this case. In those cases, the defendants *never* had a right to drive the car; here Pinkney and Jeter had legitimately borrowed the car and properly drove it from Ohio to Las Vegas. When they began to return with drugs in the car, they violated (at most) an implied provision in the verbal understanding that they had with Ms. Floyd. Put another way, in *Gordon* and *Boruff*, there was never a contract between the rental car company and the defendant; here, there was a verbal contract which the defendants arguably violated.

■■■■■ The distinction between the *Gordon* and *Boruff* situations and this one is well-recognized in other bodies of law as the difference between a *void* (i.e., non-existent) contract and a *voidable* contract. A void contract is one which never had any binding legal effect, whereas a voidable contract is one which may be legally avoided at the option of the wronged party.[36] This distinction helps to explain and reconcile the cases. In situations where a defendant obtained access to property through a contract that is void (e.g., *Gordon*), the defendant never gained an expectation of privacy and thus cannot challenge any search of the property. On the other hand, in situations where a defendant obtained access through a contract that is voidable (e.g., *Cooper*, where the defendant failed to return a rented car on time), the defendant has a legitimate expectation of privacy and can challenge the search. In this case, the agreement between the parties here cannot be viewed as

void *ab initio*, but is more akin to being merely voidable at the request of the wronged. In the absence of any effort by Ms. Floyd to void the contract, Pinkney and Jeter therefore are entitled to challenge the government's search of the car they properly borrowed.

In sum, courts should not convert every breach of contract claim into a governmental tool to block defendants from challenging a wrongful search. At the same time, the interests of the wronged party (the lenders of property) must remain protected; they may pursue their traditional remedies for breach of contract to protect their interests. But until such a process has at least been started, society is prepared to recognize a reasonable expectation of privacy in the loaned or borrowed property.

### Initial Traffic Stop

■■■■■ Officer Salas had reasonable suspicion that the defendants had committed a traffic violation. A routine traffic stop is a seizure within the meaning of the Fourth Amendment.[37] In *Terry v. Ohio*, the Supreme Court set forth a two-part test to determine whether such as stop is reasonable.[38] First, the court must ask "whether the officer's action was justified at its inception."[39] And second, the court must determine whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place."[40] "Generally, a routine stop is objectively justified when probable cause or reasonable articulable suspicion exists to believe a traffic violation has occurred."[41]

**36.** *See* BLACK'S LAW DICTIONARY 326 (7th ed.1999).

**37.** *See United States v. Botero–Ospina*, 71 F.3d 783, 786 (10th Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996).

**38.** *See* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**39.** *Botero–Ospina*, 71 F.3d at 787.

**40.** *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

**41.** *United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir.2004).

Officer Salas determined the defendants' Expedition passed him at 71 miles per hour in a 60 mile per hour zone. Furthermore, as the Expedition passed Officer Salas, he noticed that the window tint was likely darker than allowed under Utah [42] and federal law.[43] Because of both the excessive speed and the window tinting, Officer Salas properly stopped the Expedition.

### Extension of Stop

■■■■■ The Supreme Court made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." [44] During a routine traffic stop, an officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation." [45] Furthermore, an officer may further detain the driver for "questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity ... is occurring." [46]

In this case, there was at most a very modest extension of the stop during the period of time when Officer Salas asked questions not related to the traffic offense for which the defendants were stopped and further sought a consent search. The court finds reasonable suspicion for this extension. In addition to neither passenger being the registered owner, several other factors indicated to Officer Salas that criminal activity was afoot. First, the defendants were driving on a section of highway known by law enforcement as a drug corridor. Second, as Officer Salas approached the Expedition, he noticed that

the rear windows were slightly opened—an unusual fact on a high-speed, interstate highway. Third, as Officer Salas got close to the Expedition, he smelt an "overwhelming" odor of air fresheners coming from inside the Expedition. When he looked into the Expedition, he noted several air fresheners, many of different scents, located "strategically" throughout the car. Fourth, Officer Salas saw inside the Expedition three cellular phones—yet there were only two occupants. Looking at the totality of the circumstances, these fact alone, without speaking to either defendant, provided Officer Salas a reasonable articulable suspicion so as to allow him to extend the stop to conduct a brief investigation of the possibility of narcotics trafficking.

But there is more. From the outset of the stop, Officer Salas testified that when responding to his questions, neither defendant would make eye contact, both seemed evasive, and both had some difficulty in answering questions. Additionally, after being separated by Officer Salas, defendants gave inconsistent answers about Jeter's occupation. Another cause for suspicion was Jeter's statement to Officer Salas that he had been previously arrested for felonious assault.

In light of these many factors, any modest extension of the traffic stop that was required to obtain consent from the occupants to search the car was minimal and fully supported by reasonable articulable suspicion that drug trafficking was afoot.

### Consent

■■■■■ Without any evidence to the contrary, and having found Officer Salas a

---

42. See Utah Code Ann § 41–6–149.

43. See 49 C.F.R. § 571.205.

44. Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

45. United States v. Gonzalez–Lerma, 14 F.3d 1479, 1483 (10th Cir.1994), cert. denied, 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994).

46. Id.

credible witness, the court finds that defendants freely consented to a search of the Expedition. "An officer may conduct a warrantless search of a vehicle without violating the Fourth Amendment if the person in control of the vehicle voluntarily consents to the search." [47] For valid consent to have been given, the government must: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." [48]

The only evidence regarding consent was given by Officer Salas, who testified that the defendants quickly gave consent upon request, with the only condition being that he not use his K–9 unit. The defendants' consent to the search the Expedition was voluntarily given, unequivocally given, specifically and freely given, and that there was no implied or express duress or coercion to obtain the consent.

### Scope of Consent to Search

 While searching the car under this consent to search, Officer Salas quickly developed probable cause. "Probable cause to search a vehicle is established if, under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." [49] The Tenth Circuit has repeatedly held that "evidence of a hidden compartment can contribute to probable cause to search." [50] In *United States v. Jurado–Vallejo*, the Tenth Circuit set forth a two-part test to determine whether evidence of a hidden compartment can be basis for finding probable cause to search a vehicle: "(1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband." [51]

The court in *Jurado–Vallejo* found that the second factor was not a concern because "[i]f the vehicle has a hidden compartment, it was highly likely to contain contraband." [52] Here too, Officer Salas testified that based on his training and experience, a concealed or hidden compartment causes him to suspect that the vehicle's occupants are concealing some type of contraband. It was highly likely that the large, after-market hidden compartment, recently painted located on the underside of the car contained contraband. As the Tenth Circuit has explained in a similar case, "it is hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle, let alone one with the cargo space of a Ford Expedition." [53]

The defendants do not seriously dispute this point, arguing instead that Officer Salas did not really observe the hidden compartment. This position is dubious, given the fact that it is apparently undisputed that a compartment exists in precisely the place Officer Salas claimed to have spotted it. Confirming this conclusion, the videotape of the traffic stop shows Officer Salas

47. *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir.2003).

48. *Id.*

49. *United States v. Nielsen*, 9 F.3d 1487, 1489–90 (10th Cir.1993).

50. *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir.2002); *see also United States v. Jurado–Vallejo*, 380 F.3d 1235 (10th Cir.

2004); *United States v. Vasquez–Castillo*, 258 F.3d 1207, 1213 (10th Cir.2001); *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir.1997); *United States v. Nicholson*, 17 F.3d 1294, 1297–98 (10th Cir.1994).

51. 380 F.3d at 1238.

52. *Id.*

53. *Id.* at 1238–39.

looking for a hidden compartment on the underside of the car from the outset of the vehicle search. The officer's version is quite credible, and the court finds that the officer did see the hidden compartment. In light of this finding, the court finds that there was probable cause to search the Expedition, and at that point, the officer was entitled to search the entire car for illegal drugs [54]—including peeling up the Expedition's carpet and uncover the hidden compartment that contained the illegal drugs. The court need not reach the government's debatable contention that a general consent to search a car includes the right to peel up glued carpet.[55]

## CONCLUSION

For the foregoing reasons, after having first found that both defendants could assert Fourth Amendment challenges to the search in this case, the court DENIES the defendants' motions to suppress (# 36–1 and # 37–1).

SO ORDERED.

---

54. *See, e.g., United States v. Loucks,* 806 F.2d 208 (10th Cir.1986)

55. *Compare United States v. Osage,* 235 F.3d 518, 519–20 (10th Cir.2000) (search exceeded scope of consent where it destroyed container and rendered it "useless and incapable of performing its designed function") *with United States v. Marquez,* 337 F.3d 1203, 1209 (10th Cir.2003) (prying up wooden seat cover in RV was proper as part of consent search because "if damage to the compartment did occur, it was de minimis in nature, and well short of the type of 'complete and utter ... incapacitation' that was the focus of [the court's] concern in Ostage.").